# EXHIBIT 1

1
Michelle R. Matheson #019568
**MATHESON & MATHESON, P.L.C.**
2
15300 North 90th Street
Suite 550
3
Scottsdale, Arizona 85260
(480) 889-8951
4
mmatheson@mathesonlegal.com
**E-Service**: reception@mathesonlegal.com
5
Attorney for Plaintiff

SEP 0 2 2016   **FILED** 4:51 pm
MICHAEL K. JEANES, Clerk
By _____
T. Shepardson, Deputy

**PAID**
#319.00
R# 2545 7403

6

## SUPERIOR COURT STATE OF ARIZONA

7

## IN AND FOR THE COUNTY OF MARICOPA

8

| | |
|---|---|
| 9  Nicholas Alozie, a single man, | Case No.: |
| 10 | CV 2016-054324 |
| 11  Plaintiff, | |
| 12  vs. | **COMPLAINT** |
| 13  Arizona Board of Regents, a political | (Discrimination and Retaliation under |
| 14  subdivision of the state of Arizona, and | Title VII of the Civil Rights Act of |
|     Arizona State University, a public | 1964, violations of First and Fourteenth |
| 15  university, Duane Roen and Jane Doe | Amendments to the U.S. Constitution |
| 16  Roen, husband and wife, Marlene Tromp | under 42 U.S.C. § 1983) |
|     and John Doe Tromp, wife and husband, | |
| 17  Michael Crow and Jane Doe Crow, | (Jury Trial Requested) |
| 18  husband and wife, Robert Page Jr. and | |
|     Jane Doe Page, husband and wife, Mark | |
| 19  Searle and Jane Doe Searle, husband and | |
|     wife, | |
| 20 | |
| 21  Defendants. | |

22      Plaintiff Nicholas Alozie, Ph.D. ("Dr. Alozie" or "Plaintiff"), by and through his

23 undersigned counsel, for his Complaint against Defendants, states and alleges as follows:

24

25                                    **INTRODUCTION**

26      1.      This case arises from Defendants' long-standing policy and practice of

27 excluding and/or not promoting or hiring African-American individuals for high-ranking

28 academic administrative positions within the Arizona State University ("ASU")

organization.  This practice comes from the top down and permeates the institution such that, as of 2014, not one African American held the position of an academic Dean or higher at ASU.

2.      Defendants used this practice and discriminated against Plaintiff when he applied for the position of Dean of the College of Letters and Sciences.  Plaintiff was not selected for the position, and was retaliated against, because of his race and national origin when and after he applied for the position.

**PARTIES, JURISDICTION, AND VENUE**

3.      Plaintiff, a single man, is African-American, is a naturalized citizen of the United States, and was born in Nigeria. He resides in Maricopa County, Arizona.

4.      Plaintiff has been a professor/associate/assistant professor at ASU since 1991 and has served as the faculty head of the Social Science Department at ASU's Polytechnic campus since 2005.

5.      Defendant ASU is a public university which is part of the Arizona University System, which is governed by the Arizona Board of Regents.  ASU's principal campus is located in Tempe, Arizona.  It has campuses located throughout Maricopa County, Arizona.

6.      Defendant the Arizona Board of Regents is a 12-member board created under the Arizona Constitution as the governing body for the State of Arizona's public university system, which includes ASU.  The Arizona Board of Regent's principal place of business is located at 2020 N. Central Ave., Suite 230 in Phoenix, Arizona.

7.      Upon information and belief, Defendant Duane Roen and Jane Doe Roen ("Roen") are husband and wife acting for the benefit of their marital community and reside in Maricopa County, Arizona.

8.      Duane Roen is Caucasian and was selected for the position of interim, and then permanent, Dean of the ASU College of Letters and Sciences over Plaintiff.  Dr. Roen then became Plaintiff's direct supervisor at ASU.

9.    Upon information and belief, Defendant Marlene Tromp and John Doe Tromp ("Tromp") are wife and husband acting for the benefit of their marital community and reside in Maricopa County, Arizona.

10.    Dr. Tromp is Caucasian and is the Dean of the New College of Interdisciplinary Arts and Sciences at ASU. Dr. Tromp led a search committee who determined which applicants for the position of Dean of the ASU College of Letters and Sciences, including Plaintiff, would be questioned and interviewed. Dr. Tromp participated in the decision to not award Plaintiff an interview for, and thus, the position.

11.    Upon information and belief, Defendant Michael Crow and Jane Doe Crow ("Crow") are husband and wife acting for the benefit of their marital community and reside in Maricopa County, Arizona.

12.    Dr. Crow is Caucasian and the President of ASU.

13.    Upon information and belief, Dr. Crow participated in deciding to award the position of Dean of the ASU College of Letters and Sciences to Dr. Roen and not Plaintiff.  Upon information and belief, Dr. Crow thereafter participated in directing Dr. Roen's retaliatory and discriminatory actions against Plaintiff.

14.    Upon information and belief, Defendant Robert Page, Jr. and Jane Doe Page ("Page") are husband and wife acting for the benefit of their marital community and reside in Maricopa County, Arizona.

15.    Dr. Page is Caucasian and is the former Provost of ASU.

16.    Upon information and belief, Dr. Page participated in the decision to award the position of Dean of the ASU College of Letters and Sciences to Dr. Roen and not Plaintiff.  Upon information and belief, Dr. Page thereafter participated in directing Dr. Roen's retaliatory and discriminatory actions against Plaintiff.

17.    Upon information and belief, Defendant Mark Searle and Jane Doe Searle ("Searle") are husband and wife acting for the benefit of their marital community and reside in Maricopa County, Arizona.

18.     Dr. Searle is Caucasian.  He is ASU's former Deputy Provost and Chief of Staff, and is the current Provost of ASU.   Upon information and belief, Dr. Searle participated in the decision to award the position of Dean of the ASU College of Letters and Sciences to Dr. Roen and not Plaintiff.   Upon information and belief, Dr. Searle thereafter participated in directing Dr. Roen's retaliatory and discriminatory actions against Plaintiff.

19.     Drs. Roen, Tromp, Crow, Page, and Searle are all agents of ASU.   ASU is therefore liable for their conduct.

20.     Drs. Roen, Tromp, Crow, Page, and Searle are also all sued in their individual and personal capacities as they personally participated in the below-referenced conduct.

21.     Defendants caused the events and actions complained of herein to occur in Maricopa County, Arizona.

22.     Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

23.     Plaintiff also brings this action under 42 U.S.C. § 1983.

24.     Defendants ASU and the Arizona Board of Regents are employers within the meaning of Title VII.

25.     This Court has jurisdiction over this matter and venue is proper before this Court pursuant to A.R.S. §12-401.

**EXHAUSTION OF REMEDIES**

26.     On August 4, 2015, Plaintiff filed a Charge of Discrimination with the EEOC alleging race and national origin discrimination, as well as retaliation.

27.     The parties submitted statements in support of their positions.

28.     On June 10, 2016, the EEOC issued its Right to Sue Notice informing Dr. Alozie of his right to initiate a lawsuit against Defendants.

29.     Plaintiff's Title VII claims are timely filed within 90 days after Dr. Alozie's receipt of his Right to Sue Notice.

## FACTS COMMON TO ALL COUNTS

30.     Plaintiff earned a Ph.D. in 1989 in Political Economy from the University of Texas at Dallas.  He also holds a Master's Degree in Political Economy and in Public Administration, and a Bachelor's Degree in Political Science.

31.     Plaintiff has been teaching higher-education in the political science field for over 30 years and has published at least 28 peer-reviewed articles in his field.

32.     Plaintiff began his employment at ASU in 1991 as an Assistant Professor, and was promoted to Associate Professor, and tenured, in 1994.

33.     Plaintiff was promoted to professor in 2001, during which period he earned teaching, research, and service awards at ASU, and received the Arizona Governor's Award for Excellence in Collaborative Work.  During this time, Plaintiff also served as the Director of the Master's and Doctorate programs in public administration.

34.     In 2005, ASU was searching for a professor to start and build a Social Science Division at its new polytechnic campus.

35.     ASU Polytechnic East selected Dr. Alozie for the position.

36.     Dr. Alozie built and has served as the faculty head for the Social Science Department at ASU's polytechnic campus ever since.

37.     In 2009, the social science program Dr. Alozie headed became part of the newly established School of Letters and Sciences.  Dr. Frederick Corey became the Director of this School and Dr. Alozie's new supervisor.

38.     From 1991 until 2013, Dr. Alozie never received a negative review, was never put on probation, and always received merit pay increases when offered.

39.     In February 2014, ASU's then-Deputy Provost and Chief of Staff, Dr. Mark Searle, scheduled a meeting with all individuals holding management positions within the School of Letters and Sciences, including Dr. Alozie.

40.   At a February 11, 2014 meeting, Dr. Searle announced that ASU had promoted Dr. Corey to a new position as Vice Provost for Undergraduate Education.

41.   Dr. Searle then announced that Dr. Duane Roen, then-faculty head of the Interdisciplinary Studies Department within the School of Letters and Sciences, would serve as the Interim Director of the School.

42.   No one from ASU consulted Dr. Alozie or other members of his department about selecting Dr. Roen for the position of Interim Director and no search for the position was held.

43.   On May 17, 2014, Dr. Roen informed the faculty heads of the School of Letters and Sciences that the ASU Provost had decided to convert the School of Letters and Sciences into a College of Letters and Sciences, which would be governed by its own Dean.

44.   At a July 31, 2014 monthly leadership meeting within the School of Letters and Sciences, Dr. Roen announced that the position of Dean of the College of Letters and Sciences had been approved by ASU.

45.   At the meeting, Dr. Roen announced that ASU had agreed to offer him the position, but that the University would still go through the formality of a search process and advertise the position.  As discussed in further detail below, this comported with ASU's practice and policy in terms of appointing individuals to high-ranking positions. Specifically, as described below, ASU would appoint Caucasian individuals to "interim" positions, and then promote the individuals to the permanent position, either (1) without a formal search or (2) after a sham search process merely undertaken to give an appearance that the position has been opened up for competition to the public, including minorities, when in reality it has already been promised to a pre-selected candidate.

46.   On August 24, 2014, Dr. Roen emailed faculty within the College of Letters and Sciences announcing the change in his title from Interim Director to Interim Dean.

6

47.     No one from ASU consulted Dr. Alozie or other members of his department about selecting Dr. Roen for the position of Interim Dean of the College of Letters and Sciences.  This is contrary to the ASU Academic Affairs Manual Section 505-05.

48.     On October 22, 2014, ASU opened for application the position of Dean of the College of Letters and Sciences.

49.     On November 14, 2014, Dr. Alozie applied for the position.

50.     As a tenured full professor with the above-referenced experience and almost 10 years of progressive administrative experience serving as a faculty-department head, who had built an entire department from the scratch, manage run budgets, and supervised faculty and staff, Dr. Alozie was well-qualified for the position.

51.     ASU set up a search committee of ASU faculty and administrators to select and interview candidates for the position.

52.     ASU selected Dr. Marlene Tromp, a Caucasian and close friend of Dr. Roen, to head the search committee.

53.     Dr. Alozie's colleague, Patience Akpan-Obong, volunteered to be on the search committee.  She was the only African-American member of the committee.

54.     Dr. Roen, Dr. Alozie, and two other individuals applied for the position.

55.     Upon information and belief, the search committee initially planned to invite all applicants for questioning, the first phase of the application process, and then grant them all an interview as the second phase.

56.     However, upon information and belief, when the search committee received Dr. Alozie's application at the end of the application period, Dr. Tromp and/or others on the committee made the decision that only two of the four applicants would go on to be interviewed.  Upon information and belief, this was done intentionally by Dr. Tromp and/or her superiors to ensure that Dr. Alozie, a highly qualified candidate, did not reach

the interview phase of the application process and/or was not eventually selected for the position.

57.   On December 1, 2014, Dr. Alozie appeared for questioning before the search committee in connection with his application for Dean of the College of Letters and Sciences.

58.   At the outset of the meeting, Dr. Alozie told the members of the search committee that he had prepared an opening statement to read.  His statement is attached as Exhibit 1.

59.   In the interest of time, Dr. Alozie and the committee agreed he would not read his statement aloud, but that Dr. Alozie would distribute copies of the statement to all the committee members at the end of the meeting.

60.   Dr. Alozie did so and answered all questions of the search committee.

61.   Upon information and belief, after the search committee questioned interrogated all four applicants on December 1, 2014, they began discussing who to invite back for an interview.

62.   Upon information and belief, after some discussion, the committee had nearly reached an agreement to select Dr. Alozie, Dr. Roen, and one other individual for an interview. The other individual, Dr. Fabio Augusto Milner, lacked the basic administrative experience required for the position of Dean and was therefore less qualified than Dr. Alozie for the position.

63.   Upon information and belief, at this point, one of the committee members instructed the rest of the committee members to read Dr. Alozie's opening statement.

64.   In the statement, Dr. Alozie complained that ASU had not promoted or selected minorities for positions within the institution, and that the position of Dean of the College of Letters and Sciences, like all others, had already been promised to a pre-determined white male, Dr. Roen.  See Exhibit 1.

65.     Dr. Alozie's application and his statement were a challenge to ASU's practice, culture, and policy of not employing a competitive application process for high-ranking positions, resulting in the exclusion of racial and other minorities. See Exhibit 1.

66.     Dr. Alozie's statement constitutes protected conduct.

67.     Dr. Alozie's statement is also protected speech under the First Amendment to the U.S. Constitution and is regarding a matter of public concern.

68.     Upon information and belief, after the committee members read Dr. Alozie's statement, a heated discussion ensued and Dr. Tromp summarily ended the meeting before the committee decided who to invite for interviews. Upon information and belief, the committee never resumed their meeting, and, rather, Dr. Tromp and others in ASU's administration decided summarily not to invite Dr. Alozie for interview.

69.     The following morning, December 2, 2014, Dr. Tromp emailed Dr. Alozie to inform him that he would not be invited to interview for the position.

70.     Thus, in direct response to Dr. Alozie's opening statement concerning discrimination at ASU, which constitutes protected speech and conduct, Dr. Tromp and ASU decided not to offer Dr. Alozie an interview for the position, and thus the position, of Dean of the College of Letters and Sciences. In this regard, ASU discriminated and retaliated against Dr. Alozie.

71.     Upon information and belief, Drs. Crow, Searle and Page participated in the decision not to award Dr. Alozie the position and/or invite him for an interview. Upon information and belief, their decision was also based, in part, on Dr. Alozie's protected conduct, speech, and/or his race or national origin.

72.     Upon information and belief, ASU interviewed Dr. Roen and Dr. Milner for the position. Upon information and belief, ASU decided to interview Dr. Milner, an unqualified candidate, over Dr. Alozie to both discriminate against Dr. Alozie and create less competition for Dr. Roen, in order to ratify ASU's initial decision awarding the position to Dr. Roen.

73.   ASU awarded the position to Dr. Roen in February 2015.

74.   As indicated by Dr. Roen in 2014, this outcome was predetermined and the search committee process was only a formality in terms of making ASU's application process appear competitive.  As discussed below, this is ASU's practice and policy.

75.   Within days after ASU announced Dr. Roen as the new Dean of the College of Letters and Sciences, Dr. Alozie filed a Complaint with ASU's Office of Equity and Inclusion alleging he had been discriminated against in the hiring and application process for the position.  Dr. Alozie's Complaint is further protected conduct and is attached as Exhibit 2.

76.   Immediately after Dr. Alozie engaged in protected conduct by challenging ASU's discriminatory hiring practices, ASU and its agents began a course of conduct designed to continue to discriminate and retaliate against Dr. Alozie because of his race, national origin, and protected conduct and speech.

77.   Specifically, within days of the search committee's meeting with Dr. Alozie, Dr. Roen, who was Dr. Alozie's immediate supervisor as acting Interim Dean, announced that, for the first time in years, he would be conducting annual evaluations of the faculty heads within the College of Letters and Sciences, including Dr. Alozie.

78.   Upon information and belief, Dr. Roen made this decision because he knew about what had happened with the search committee and decided to further discriminate and retaliate against Dr. Alozie on the basis of his race and national origin and for engaging in protected conduct and speech.

79.   Dr. Roen gave Dr. Alozie the first negative review of Dr. Alozie's career. The review is attached as Exhibit 3.

80.   Dr. Roen's review of Dr. Alozie was flawed in both its criticisms of Dr. Alozie and the benchmarks by which Dr. Alozie is measured and was a pretext for unlawful discrimination and retaliation.

81. Additionally, Dr. Roen did not follow the Academic Affairs Manual Sections 111-03 and 202-01 in conducting his review of Dr. Alozie by not affording proper weight to Dr. Alozie's administrative duties and by not seeking input from members of Dr. Alozie's academic assembly.

82. Dr. Roen then used this pretextual review to attempt to put Dr. Alozie on a performance improvement plan ("PIP"). Dr. Roen did this even though it is against the Academic Affairs Manual Section 506-11 to put someone on a PIP who receives a "satisfactory" rating, like Dr. Alozie did.

83. Also, as a faculty head, Dr. Alozie normally receives a 12-month "Notice of Appointment" (NOA) from the ASU Provost, which he accepts to formalize his position.

84. After Dr. Roen became Dr. Alozie's supervisor, Dr. Alozie received only a probationary 3-month NOA for his position as faculty-department head, with certain conditions that he needed to meet in order to be granted an appointment for the remaining 9 months. See Exhibit 4. Also this time the NOA came from Dr. Roen, and not the Provost.

85. Upon information and belief, Drs. Crow and Page participated in the decision to award Dr. Alozie a probationary, instead of his usual 12-month, NOA.

86. The negative review, PIP, and probationary NOA constitute discipline and negatively affected the terms and conditions of Dr. Alozie's employment.

87. Dr. Alozie supplemented his Complaint to the Office of Equity and Inclusion with these new developments and events of discrimination and retaliation.

88. After Dr. Roen assumed his new position as Dean of the College of Letters and Sciences, Dr. Alozie received pushback from ASU on his request that the University replace his primary degree program, a Bachelor's in Science, Technology, and Society, with traditional degrees in Social Science and Political Science, although all parties, including both Dr. Roen and the Provost, had signed off on the plan much earlier in 2014 before Dr. Alozie applied for the Dean position.

89.     This established pattern of frustrating Dr. Alozie's efforts to build programs and grow his faculty continued with Dr. Alozie's subsequent applications for a Bachelor's and Master's program in Integrative Social Science, programs that were both approved at a time the university knew it was under investigation by the EEOC, but are now receiving a pushback.

90.     Upon information and belief, ASU was attempting to eliminate Dr. Alozie's programs and/or degrees at the polytechnic campus in an effort to further eliminate his position and accomplish its discriminatory objectives.

91.     While the above-referenced individuals and ASU were engaging in the above-described misconduct, ASU began doing damage control in anticipation of possible EEOC scrutiny, and in an apparent attempt to refute the statistics in Dr. Alozie's opening statement regarding the disparity in minorities at ASU serving in high-ranking academic administrative positions.

92.     ASU did this by summarily appointing a few new women and minorities to positions previously held by white males.  That these new appointments were merely for show and to boost ASU's minority statistics is evidenced by the fact that all or nearly all of the white males who previously held such positions were given newly made up or other positions within the institution.

93.     In actuality, ASU uses its policy and practice of appointing interim, and then permanent, positions to accomplish its discriminatory objectives.

94.     ASU's administrators, including Drs. Crow, Page, Searle, and, in Dr. Alozie's case, Tromp, perpetuated and instilled this policy and practice.

95.     Over the past twelve years, all or nearly all times that ASU appointed an individual to an "interim" position it subsequently selected that individual for the permanent position.  And the individuals who ASU selected for such positions were all, or nearly all, Caucasian.

96.   Upon information and belief, ASU and its administrators also utilized the practice and policy of internally appointing, and not opening to the public, high-ranking positions.  The individuals who ASU selected for such positions were also all, or nearly all, Caucasian.

97.   These practices and policies have resulted in an administration where, upon information and belief, not one African American held the position of academic Dean or higher in 2014.   Thus, these practices and policies have had a disparate and negative impact on African-American academic employees like Dr. Alozie.

98.   Upon information and belief, ASU and its administrators such as Drs. Crow, Page, and Searle utilizes these practices and policies so that minorities cannot compete on a level playing field for permanent, high-ranking academic positions.

99.   Dr. Alozie has been damaged by these practices and policies by not being selected for the position of Dean of the College of Letters and Sciences, resulting in lost wages and income, by losing an opportunity to garner a more prestigious position that elevates his current and future career prospects within or beyond the university, by being extremely embarrassed before colleagues who continue to wonder why the head of their department could not even scale the initial screening for a dean position within the college, by the negative evaluation review in his personnel file that will surely impact his career prospects moving forward, and by being punished in the form of discipline and the adverse employment conditions and restrictions mentioned above.

**COUNT I (Race and National Origin Discrimination – Title VII – ASU and Arizona Board of Regents)**

100.   Plaintiff incorporates the preceding Paragraphs of this Complaint as if fully set forth herein for this Paragraph.

101.   Dr. Alozie is African American and from Nigeria, and is therefore a member of protected classes.

102.   Dr. Alozie was well-qualified for the position of Dean of the College of Letters and Sciences.

103.   ASU did not select Dr. Alozie for the position.  Rather, ASU selected Dr. Roen, a Caucasian of American descent.

104.   Upon information and belief, ASU did not select Dr. Alozie for the position because of his race and/or national origin, and/or his or national origin was a motivating factor in the decision.

105.   As a result, Dr. Alozie lost the position of Dean of the College of Letters and Sciences, and resulting wages, benefits, and/or pay increases, and negative career prospects outlined above.

106.   Additionally, Dr. Alozie performed his job as a faculty department head in a satisfactory manner.

107.   ASU imposed difficult terms and conditions of employment on Dr. Alozie because of his race and/or national origin, by giving him a negative review, putting him on a PIP, giving him a probationary NOA, and engaging in action that limited his ability to grow his department.

108.   Upon information and belief, Dr. Alozie's non-African American and non-Nigerian similarly situated counterparts were not similarly disciplined or put on probation.

109.   Defendants' conduct constitutes unlawful discrimination against Dr. Alozie on the basis of his race and national origin.

**COUNT II (Retaliation – Title VII - ASU and Arizona Board of Regents)**

110.   Plaintiff incorporates the preceding Paragraphs of this Complaint as if fully set forth herein for this Paragraph.

111.   Title VII makes it an unlawful employment practice for a person covered by the Act to discriminate against an individual "because he has opposed any practice

14

made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

112.   Dr. Alozie engaged in or was engaging in an activity protected under the law when he submitted his opening statement to the ASU search committee and when he filed and supplemented his Complaint of discrimination with the ASU Office of Equity and Inclusion.

113.   As a result of these complaints of discrimination, and in retaliation for same, ASU did not select Dr. Alozie for an interview for, or for the position of, Dean of the College of Letters and Sciences, subjected him to discipline, and/or worsened the terms and/or conditions of his employment.

114.   Defendants would not have taken these adverse employment actions against Dr. Alozie but for Dr. Alozie's protected and lawful conduct.

115.   As a result of Defendants' retaliation against Dr. Alozie, Dr. Alozie lost the position of Dean of the College of Letters and Sciences, and resulting wages, benefits, and/or pay increases, was disciplined, and suffered worse terms and/or conditions of his employment.

## COUNT III (Disparate Impact – Title VII- ASU and Arizona Board of Regents)

116.   Plaintiff incorporates the preceding Paragraphs of this Complaint as if fully set forth herein for this Paragraph.

117.   As more fully described above, Defendants ASU and the Arizona Board of Regents employed the practice and policy of appointing "interim" positions as a means to summarily appoint its chosen candidate to the permanent position, without having to engage in an open, competitive application process.

118.   Defendants also employed the practice and policy of appointing individuals summarily to positions without opening up the position to a competitive application process.

119.   Defendants' practices and policies have resulted in an academic administration with no African-Americans as of 2014.

120.   Accordingly, Defendants' practices and policies have had a disparate and discriminatory impact on African-Americans such as Dr. Alozie.

121.   Dr. Alozie has been damaged by such practices when he applied for and was not awarded the position of Dean of the College of Letters and Sciences.

122.   The position was awarded to a Caucasian male who had been appointed the "interim" Dean prior to the sham open application process.

**COUNT IV (42 U.S.C. § 1983 – First Amendment to the United States Constitution – Drs. Roen, Tromp, Crow, Page, and Searle in their personal capacities)**

123.   Plaintiff incorporates the preceding Paragraphs of this Complaint as if fully set forth herein for this Paragraph.

124.   Defendants Drs. Roen, Tromp, Crow, Page, and Searle are all administrators and/or Deans, as more fully described above, at ASU, a state university.

125.   Thus, Defendants Drs. Roen, Tromp, Crow, Page, and Searle were all acting under color of law.

126.   Plaintiff's right to oppose racial discrimination and to not be retaliated against for speaking about such opposition is protected by the First Amendment to the United States Constitution.

127.   Plaintiff engaged in free speech when, among other things, he prepared and submitted a statement to the ASU search committee challenging ASU's racial hiring and promotion practices.

128.   Plaintiff's speech was regarding a matter of public concern, and Plaintiff's interest in commenting on the matter outweighed any of the Defendants' interests.

129.   As a result of Plaintiff's protected First Amendment speech, Defendants Drs. Roen, Tromp, Crow, Page, and Searle retaliated and discrimination against Plaintiff in that Plaintiff was not awarded the position of Dean of the College of Letters and Sciences, he was disciplined, the terms and conditions of Plaintiff's employment were worsened, and Defendants began attempts to eliminate his programs.

130.   Defendants Drs. Roen, Tromp, Crow, Page, and Searle personally participated, knew about, and acquiesced in the retaliation and discrimination as more fully described above.

131.   Plaintiff has been subjected, by the above described events, to a deprivation of his rights, privileges, or immunities secured by the First Amendment to the U.S. Constitution.

**Count V (42 U.S.C. § 1983 – Equal Protection Clause of the Fourteenth Amendment – Drs. Roen, Tromp, Crow, Page, and Searle in their personal capacities)**

132.   Plaintiff incorporates the preceding Paragraphs of this Complaint as if fully set forth herein for this Paragraph.

133.   Defendants Drs. Roen, Tromp, Crow, Page, and Searle are all administrators and/or Deans, as more fully described above, at ASU, a state university.

134.   Thus, Defendants Roen, Tromp, Crow, Page, and Searle were all acting under color of law.

135.   As more fully described above, Plaintiff was treated differently from his similarly situated Caucasian counterpart, Dr. Roen, based on his race and protected conduct.

136.   Upon information and belief, Defendants Drs. Roen, Tromp, Crow, Page, and Searle intentionally discriminated against Plaintiff based on his race and because of his protected conduct.

137.   As a result, Plaintiff suffered damages.

138.    Defendants Drs. Roen, Tromp, Crow, Page, and Searle personally participated, knew about, and acquiesced in the retaliation and discrimination as more fully described above.

139.    Plaintiff has been subjected, by the above described events, to a deprivation of his rights, privileges, or immunities secured by the Fourteenth Amendment to the U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff prays for relief against Defendants as follows:

a.  For compensatory damages in the form of lost income as a result of not being selected for the position of Dean of the College of Letters and Sciences, and lost future income from lost opportunities;

b.  For Plaintiff's costs and attorneys' fees; and

c.  For such further relief as this Court deems just and proper given the considerable damage the defendants have done to the Plaintiff's otherwise bustling administrative career in loss of reputation, and other opportunities for professional advancement.

DATED this 2nd day of September 2016.

MATHESON & MATHESON, P.L.C.

By: _Michelle R. Matheson_

Michelle R. Matheson, #019568
*Attorney for Plaintiff*

Opening Statement to Dean's Search Committee
College of Letters and Sciences
December 1, 2014

EXHIBIT
1

Dr. Nicholas Alozie

Good Afternoon:

Thank you for the invitation to meet with you. This is a very special day in the history of ASU, and I will tell you why.

In the 24 years I have been at ASU, I have worn two hats. The first hat is that of a faculty member working, just like everyone else, to build a career and to contribute to the well-being of students and the institution. The second hat is that of a community diversity leader helping to build an environment conducive for women and minority scholars to succeed at ASU.  I would say I have been very successful at both.

The latter hat led me to the position of chairperson of the ASU Black Caucus, where only a few years back and among other issues, I worked with Milt Glick, our former provost, and other top ASU officials to close the "Revolving Door" of minority scholars leaving ASU as quickly as they arrived because they didn't think the environment was favorable enough to warrant their staying at ASU. The complaint among young minority faculty was that ASU was simply a stopover and for a

rewarding career with advancement they had to move on to another university. They never saw ASU as a place to build a career.

The fact that as a homegrown product of ASU having advanced through the ranks at ASU to head a faculty unit for nine years continuously, I am sitting before you here today to compete for the position of Dean at ASU is historic. That is what makes this a very special day. Traditionally, ASU is one of those places where we scramble to get minority scholars from outside to apply for these kinds of positions. If Provost Glick were here today, he would be proud of this milestone for ASU, although there are not many colleges at the university where the same success can be observed.

Having said that, I must confess that the decision to apply for this position was a difficult one for me.  The circumstances of my application may offend some people and may even lead to a blowback. This is why my application came in at the very last minute. I had to carefully consider the decision to indicate my interest in this position.

Indeed, the word in the College is that there is really no vacancy here, that this Dean's position has already been promised and that the university is simply going through the motions to dot its i's and cross its t's with this hiring process. Thus, I am expected, just like everyone else in the college, to back off and let the impending coronation take place.

2

I made the decision to apply for this position for two primary reasons. First, and foremost, I believe I am well qualified for this position as per the stated requirements.  Indeed, the position of faculty or unit head is the breeding ground for university deans as a quick perusal of any edition of *The Chronicle of Higher Education* will attest. Nine years ago, I was hired to start a brand new faculty and I have led that unit continuously since then without acrimony or problems for the university. Prior to that, I was the director of a master's degree program and university-wide interdisciplinary doctoral program in public administration. I have therefore had 14 years of continuous administrative experience at ASU, among other responsibilities that I have shouldered, as my CV shows.  As a frequent surfer of ASU WebPages, I am fully aware of the resume of practically everyone holding what can be considered a top management position at ASU today. Many are not even full professors. And some have been given enabling titles such as professor of practice just to get them to fit the mode. Thus, when I place my resume against the bunch, one verdict is clear. My resume is very competitive.

The second reason that I decided to apply for this position is because I have devoted the better part of my adult life working to create a level playing field for women and minorities. My advice to them in this regard has always been to apply with confidence for

positions for which they are eligible and let the process take its course. I therefore had to practice what I preach to others.

Now, let me speak about the nature of this Dean's position itself. There are positions that, because of their unique nature, require relevant experience, as opposed to just experience. This Dean's position is one of them. Members of this Committee are well aware of the unique nature of CLS as a college. It is not a job for someone simply looking for a typical Dean's position. It is a job for someone who already knows the lay of the land, appreciates the complexity of the position, and can hit the ground running from the first day.

I came to the Polytechnic Campus to a unit that was called East College and I was tasked with the responsibility of building a social science division from scratch as part of the College. And then we became School of Applied Arts and Sciences, which got disestablished and the School of Letters and Sciences emerged with new designations and mission. Through the various transformations, I have been here building and nurturing a unit, and working at the highest administrative level with provosts and various deans. I understand this college in its various configurations.

In closing, I want to thank the committee again for this opportunity to talk about my eligibility for the position of the Dean of College of Letters and Sciences. I believe I have exceeded the

4

advertised requirements for this position. Also, my experience of working at the highest levels of this college for several years has given me sufficient insight into the issues unique to this college especially given its multidisciplinary and multi-campus nature. Moreover, my additional experience working with the University's central administration over the years gives me good knowledge of ASU and its operations. The College of Letters and Sciences needs an entrepreneurial, visionary leader with the ability to engineer and execute ideas in line with the vision of the New American University. Leadership is about both vision and execution. I hope this committee will offer me the opportunity to share mine for the College of Letters and Sciences.

---END---

**EXHIBIT 2**

**Subject:** Fwd: Complaint of Violation of Affirmative Action/Equal Opportunity

**From:** Nicholas Alozie (ALOZIE@asu.edu)

**To:** nicholas.alozie@yahoo.com;

**Date:** Monday, August 3, 2015 8:57 AM

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: Nicholas Alozie
Date:03/12/2015 12:55 PM (GMT-07:00)
To: Janina Kokins
Subject: Complaint of Violation of Affirmative Action/Equal Opportunity

Dear Ms. Kokins:

Re: Search for Dean, College of Letters and Sciences

My name is Nicholas Alozie. I am a professor of public policy and head of the faculty of social science in the College of Letters and Sciences at the Polytechnic campus. I have been teaching at ASU since 1991. Per our phone conversation earlier today, this note is coming to you (the Office of Equity and Inclusion) pursuant to the University's stated grievance process and procedure on the ACD 401 regarding violation of Affirmative Action/Equal Opportunity laws at ASU. If you are not the appropriate person to handle this matter, please forward to the appropriate person. This complaint is regarding my candidacy for the search referenced above, which was concluded recently with a formal announcement of an appointment from the ASU Provost's Office dated February 25, 2015. By law, the date of the Provost's announcement of an appointment marks the end of the search process and the beginning of the 30-day window which I have by ASU regulations to initiate this complaint. I am filing this complaint because university, state and federal regulations/laws on affirmative action and equal opportunity were violated in the manner and process in which this search and offer were conducted. Because there was no job number, I am attaching the formal announcement for the position and the offer announcement emails from Provost Page and John Priewe, Assistant to the university Provost for your reference.

I am traveling overseas on a family emergency tomorrow and will not return until March 23, 2015 (my airline ticket is attached). This note is coming to you as the initiation of my formal complaint pursuant to the 30-day window. I would have waited until my return, but I did not want any difficulty with airline schedules to delay or interfere with the 30-day window and my opportunity to initiate this complaint. I will make contact with your office upon my return to the U.S. and the university on how we proceed. Please let me know if you have any questions regarding this email as I will be in transit beginning tomorrow at noon and will have no access to immediate email or phone communication.

Very sincerely, Nick

Case 2:16-cv-03944-ROS   Document 1-1   Filed 11/14/16   Page 26 of 40

Nicholas O. Alozie, Ph.D.
Professor of Public Policy and Head
Faculty of Social and Behavioral Sciences
School of Letters and Sciences
Arizona State University - Poly Campus
7271 E. Sonoran Arroyo Mall - MC 2780
Mesa, Arizona 85212-6415
Phone: (480) 727-1395; Fax: (480) 727-1671
E-Mail: Alozie@asu.edu<mailto:Alozie@asu.edu>



nicholas.alozie - Yahoo Mail

Page 1 of 1

Home   Mail   Search   News   Sports   Finance   Weather   Games   Answers   Screen   Flickr   Mobile   More

Alozie AirTicket.pdf  Download     1 - of 1

Search                         Search Mail      Search Web      Home      Nicholas

Compose

Inbox
Drafts
Sent
Spam
Trash
Smart Views
  Important
  Unread
  Starred
  People
  Social
  Travel
  Shopping
  Finance
Folders
Recent

Sponsored

Your Arrest R

Your Past Expe
Anyone can se
typing in a Nan
State with Insta
Checkmate

# EAST WEST TRAVEL

www.eastwesttrip.com
9888 Bissonnet St.,Suite 100 A.
Houston, TX-77036.

**Bill To**

ALOZIE NICHOLAS MR
4040 E.MCLELLAN RD #7
MESA, AZ  85205
(480) 332-4261

| Item | Description |
|------|-------------|
| Airlines Tickets | FOR: ALOZIE/NICHOLAS   E-TKT 0167580368457 |

13 MAR 15  -  FRIDAY
   AIR   UNITED AIRLINES       FLT:1555       UNITED ECONOM
      LV PHOENIX                    129P       EQP: BOEING 73
      DEPART: TERMINAL 2                       02HR 35MIN
      AR HOUSTON GEO BUSH   604P       NON-STOP
      ARRIVE: TERMINAL C                         REF: IDP36F
      ALOZIE/NICHOLAS      SEAT-36F
   AIR   UNITED AIRLINES       FLT:142        UNITED ECONOM
      LV HOUSTON  BUSH        920P       EQP: 788
      DEPART: TERMINAL E                        11HR 30MIN
14 MAR 15  -  SATURDAY
      AR LAGOS                       250P       NON-STOP
      ALOZIE/NICHOLAS   SEAT-24E
22 MAR 15  -  SUNDAY
   AIR   UNITED AIRLINES       FLT:143        UNITED ECONOM
      LV LAGOS                       910P       EQP: 788
23 MAR 15  -  MONDAY
      AR HOUSTON BUSH        500A       NON-STOP
      ARRIVE: TERMINAL E                        REF: IDP36F
      ALOZIE/NICHOLAS   SEAT-24D
   AIR   UNITED AIRLINES       FLT:1272       UNITED ECONOMY
      LV HOUSTON  BUSH        907A       EQP: BOEING 737-8
      DEPART: TERMINAL C                        03HR 02MIN
      AR PHOENIX                    1009A      NON-STOP
      ALOZIE/NICHOLAS   SEAT-37D
================================================
UNITED AIRLINES CONFIRMATION IDP36F

## Nicholas Alozie

**From:**        Janina Kokins
**Sent:**        Thursday, March 19, 2015 1:42 PM
**To:**          Nicholas Alozie
**Subject:**     Meeting with OEI

Good afternoon. I am writing to confirm your meeting with Erin Ellison for Wednesday, March 25, at 10:00 a.m. We are located in the University Center, Bldg A, 1100 E University Drive, Tempe (approximately two blocks east of Rural Road; north side of University; single story, red brick building). The entrance is located on the east side of the building. You may use the following parking code in lieu of paying: 39291824. You will be prompted for the number of the spot you parked in, so note that before walking away. When you arrive, please check in at the desk in the lobby and they will let us know you are here.

Below is a link to an interactive map: enter University Center in the search engine, then you can zoom in and out for the best route to take to our location.

http://www.asu.edu/map/interactive/#

Regards,


Janina Kokins
Office of Equity and Inclusion
Arizona State University
480.965.5057
480.237.7998 (eFax)
Mail Code 1304

**From:** Nicholas Alozie
**Sent:** Thursday, March 19, 2015 11:10 AM
**To:** Janina Kokins
**Subject:** RE: Request for Conference Call

Wednesday should be good for me, between the 9:00am to 12:00pm frame. Also, after lunch is good.



Sent from my T-Mobile 4G LTE Device


-------- Original message --------
From: Janina Kokins
Date:03/19/2015 6:45 PM (GMT+01:00)
To: Nicholas Alozie
Subject: RE: Request for Conference Call

Erin would like to meet with you for informational purposes only. She would like to meet in person so please let me know whether you are available on Wednesday and what timeframe.

Regards,

1

Janina Kokins
Office of Equity and Inclusion
Arizona State University
480.965.5057
480.237.7998 (eFax)
Mail Code 1304

---

**From:** Nicholas Alozie
**Sent:** Thursday, March 19, 2015 10:26 AM
**To:** Janina Kokins
**Subject:** RE: Request for Conference Call

Thank you for your email. I was able to get T-Mobile to open my phone internationally. Thus, I have full access to my emails on my cell phone. My number is 480-332-4261. I will be available throughout Tuesday and Wednesday of next week. I will return on Monday and will be teaching a class from 1:30-4:15pm. I will be glad to speak with Erin alone. However, I have retained a lawyer who, I would suggest, should probably participate if the conversation will involve any technical legal matters.

Sincerely,
Nick.


Sent from my T-Mobile 4G LTE Device

---

-------- Original message --------
From: Janina Kokins
Date:03/19/2015 4:04 PM (GMT+01:00)
To: Nicholas Alozie
Subject: Request for Conference Call

Good morning. I am writing on behalf of Erin Ellison, Sr EEO Consultant, Office of Equity and Inclusion, to schedule a conference call regarding the matter you contacted our office about. Please let me know your availability or if your calendar in Outlook is up-to-date, I will find a mutually convenient time for you and Erin to speak when you return to the office. Also, let me know what number Erin should call you at.

Regards,


Janina Kokins
Office of Equity and Inclusion
Arizona State University
480.965.5057
480.237.7998 (eFax)
Mail Code 1304

2

## Nicholas Alozie

| | |
|---|---|
| **From:** | Janina Kokins |
| **Sent:** | Thursday, March 19, 2015 8:05 AM |
| **To:** | Nicholas Alozie |
| **Subject:** | Request for Conference Call |
| | |
| **Follow Up Flag:** | Follow Up |
| **Due By:** | Thursday, March 19, 2015 9:08 AM |
| **Flag Status:** | Flagged |

Good morning.  I am writing on behalf of Erin Ellison, Sr EEO Consultant, Office of Equity and Inclusion, to schedule a conference call regarding the matter you contacted our office about.  Please let me know your availability or if your calendar in Outlook is up-to-date, I will find a mutually convenient time for you and Erin to speak when you return to the office.  Also, let me know what number Erin should call you at.

Regards,

Janina Kokins
Office of Equity and Inclusion
Arizona State University
480.965.5057
480.237.7998 (eFax)
Mail Code 1304

1

## Nicholas Alozie

**From:**       Erin Ellison
**Sent:**       Tuesday, March 31, 2015 1:18 PM
**To:**         Nicholas Alozie; BEVERLY WALKER
**Subject:**    RE: Our Meeting Yesterday

Thank you Dr. Alozie. We will investigate this matter accordingly. Please send me a copy of your packet at your earliest convenience.

Thank you.


Regards,

Erin R. Ellison, J.D.
Senior EEO Consultant
Arizona State University, Office of Equity & Inclusion
(480) 727-2728
(480) 237-7998 (eFax)

 ARIZONA STATE UNIVERSITY


**From:** Nicholas Alozie
**Sent:** Thursday, March 26, 2015 12:13 PM
**To:** Erin Ellison; BEVERLY WALKER
**Subject:** Our Meeting Yesterday

Dear Erin and Beverly,

Thank you for taking the time out yesterday to meet with me regarding the complaint I have filed with the Office of Equity and Inclusion. I want to reiterate the point I made during our discussion that my preference is for this matter to be handled as part of institutional development. I have kept quiet about it all this time because of the extreme embarrassment its appearance in the media will bring to ASU. This is why I am still hoping that it can be handled in a manner that precludes such negative outcome.

Again, thank you for your time.

Very Respectfully,

Nick.

*Nicholas O. Alozie, Ph.D.*

Professor of Public Policy and Head
Faculty of Social and Behavioral Sciences
School of Letters and Sciences
Arizona State University - Poly Campus
7271 E. Sonoran Arroyo Mall - MC 2780
Mesa, Arizona 85212-6415

1

Phone: (480) 727-1395; Fax: (480) 727-1671
E-Mail: Alozie@asu.edu



**EXHIBIT 3**

Date:   March 29, 2015

To:     Nickolas Alozie, Professor and Faculty Head

From:   Duane Roen, Dean, College of Letters and Sciences and University College

RE:     Your 2014 Annual Evaluation

Based on your self-evaluation, the evaluation from your colleagues, and my observations of your work, your evaluation score is **2.40, Satisfactory**.

Formula: (2.0 x .30) + (4.0 x .20) + (2.0 x .50) = 2.40

**Research (30%) (2.0, Satisfactory)**

In the research section of Appendix A, you don't list any publications with 2014 publication dates, so I assume that there were no publications in 2014. However, you do have one forthcoming publication. Four manuscripts are under review, and one is in progress. You mention that the manuscripts are "high-quality journal articles," but that assessment can apply only to the manuscript that is forthcoming. That is, peer reviewers have deemed that it is of sufficiently high quality to be published. You list one conference paper, but there is no date on it, so I can't tell for certain whether you presented it in 2014. I would expect more publications and conference presentations from a tenured full professor.

**Teaching (20%) (4.0, Merit Plus)**

Your teaching load is appropriate for a tenured professor with administrative duties as a faculty head—one course per semester. Further, the course evaluation scores are solid, with mean scores ranging from 1.0 to 1.2.

**Service (50%) (2.0, Satisfactory)**

It is good that you are mentoring your colleagues Kathy Thomas and Patience Akpan-Obong by co-authoring with them. That is an important part of service. Your service also includes duties as a member of editorial boards for two journals and a reviewer for five journals. The outreach efforts that you mention are also important forms of service.

You service/administrative work as faculty head is mixed. There are areas where you need to improve. In particular, I would like to see you do a better job of

- Responding to email requests for information or materials from administrative staff and from me.
- Adhering to university policies and procedures related to hiring, purchasing, and travel.
- Communicating information about policies and procedures to faculty.
- Responding promptly to students who have concerns about faculty who report to you.
- Being available to faculty, staff, and students in your Polytechnic campus office.

**Overall**

Your strength seems to lie in teaching and in service to professional organizations. I encourage you to spend more time on publishing and conference presentations. I also encourage you to be more proactive and responsive in your role as faculty head.

Because you have not received substantive evaluations during the past few years, I have been generous in my evaluations of your research and service for 2014. However, the expectation is that you will increase your research productivity and that you will devote more attention to your administrative duties. If you were to maintain you current record of research and service in 2015, that would result in an unsatisfactory rating next spring.

-----------------------------------------------------------------------------------------------------------------

I agree/disagree (circle one) with this evaluation. Comment below and on the back of this sheet if you wish.

Signature indicating receipt: _____
                                    Nicholas Alozie                            Date





EXHIBIT
4

June 30, 2015

Nicholas Alozie
Professor
College of Letters and Sciences
Arizona State University

Dear Nick:

On behalf of the College of Letters and Sciences we are pleased to offer you an appointment as Faculty Head beginning July 1, 2015. In this administrative position you will be responsible to the Dean of the College of Letters and Sciences. This administrative appointment is for the period July 1, 2015 to September 30, 2015 and may be extended pending performance review. Your fiscal year salary will be $122,179. As a continuing employee of Arizona State University you will be eligible for any university-wide salary adjustments should they become available.

This administrative appointment will have no effect upon your academic rank or tenure status. Should it be decided at some future date that you will return to full-time faculty status, your 12 month fiscal-year salary will be converted to a 9 month academic-year salary by dividing by 26 and multiplying by 20 to coincide with the academic payroll calendar.

Before I consider a subsequent appointment, you will need to demonstrate greater attention and commitment to the duties of a faculty head. In particular, you need to be promptly responsive to requests to provide information or take action — whether those requests come from staff, advisors, or me. The college and the university depend on faculty heads and their faculty teams to be proactive in seeking grants and gifts, in growing enrollment, in scheduling classes to meet demand, and in providing other service to ASU.

Between now and September 30, you and I will meet regularly to discuss the faculty head duties and responsibilities in your unit, as well as your performance.

By accepting this appointment, you agree to comply with the rules and regulations of the University, including those in the ACD Manual, and the Arizona Board of Regents relating to your appointment, including the Conditions of Administrative Service, the Conditions of Faculty Service, the provisions of Standards of Professional Conduct for Faculty Members and Academic Professionals, the Code of Ethics, and the Arizona Board of Regents Intellectual Property Policy.

This offer will remain open until July 1, 2015. If you accept this offer, please sign and date this letter where indicated and return the original to the Dean's Office by the date specified above. We join the department faculty in hoping you will accept our offer.

Sincerely,

*Duane H. Roen*

Duane H. Roen
Dean, University College
Dean, College of Letters and Sciences

Accepted: _____     7-17-2015
Nicholas Alozie                                  Date

*Note: My Signature on this document is not valid except read in conjunction with the objection note, which must accompany this document at all times.*

College of Letters and Sciences
Mail Code 0120
411 N. Central Ave., Suite 300
Phoenix, AZ 84004-0694

# EXHIBIT 2

**In the Superior Court of the State of Arizona**
**In and For the County of** Maricopa

# CV2016-054324

(Please Type or Print)

Plaintiff's Attorney  Michelle R. Matheson

Attorney Bar Number  019568

MICHAEL K. JEANES, CLERK
BY
*Shepardson*
T. SHEPARDSON, FILED
16 SEP -2  PM 4: 49

Is Interpreter Needed?  ☐ Yes  ☑ No
If yes, what language:

| Plaintiff's Name(s): (List all) | Plaintiff's Address: | Phone #: | Email Address: |
|---|---|---|---|
| Nicholas Alozie | Matheson & Matheson, PLC | 480-889-8951 | reception@mathesonlegal.com |
| | 5300 N 90th St, Ste 550 | | |
| | Scottsdale, AZ 85260 | | |

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)  Arizona Board of Regents, a political subdivision of the state of Arizona, and Arizona

State University, Duane Roen and Jane Doe Roen, Marlene Tromp and John Doe Tromp, Michael Crow and Jane Doe Crow,

(List additional defendants on page two and/or attach a separate sheet)

EMERGENCY ORDER SOUGHT:  ☐ Temporary Restraining Order  ☐ Provisional Remedy  ☐ OSC

☐ Election Challenge  ☐ Employer Sanction  ☐ Other _____
(Specify)

☐ RULE 8(i) COMPLEX LITIGATION APPLIES. Rule 8(i) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties.

(Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category.)

☐ THIS CASE IS ELIGIBLE FOR THE COMMERCIAL COURT UNDER EXPERIMENTAL RULE 8.1. (Maricopa County only.) Rule 8.1 defines a commercial case and establishes eligibility criteria for the commercial court. Generally, a commercial case primarily involves issues arising from a business contract or business transaction. However, consumer transactions are not eligible. A consumer transaction is one that is primarily for personal, family or household purposes. **Please review Rule 8.1 for a complete list of the criteria**. See http://www.superiorcourt.maricopa.gov/commercial-court/. You must check this box if this is an eligible commercial case. **In addition, mark the appropriate box below in the "Nature of Action" case category**. The words "commercial court assignment requested" must appear in the caption of the original complaint.

## NATURE OF ACTION

(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**

☐ 101 Non-Death/Personal Injury
☐ 102 Property Damage
☐ 103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**

☐ 111 Negligence
☐ 112 Product Liability – Asbestos
☐ 112 Product Liability – Tobacco
☐ 112 Product Liability – Toxic/Other
☐ 113 Intentional Tort

☐ 114 Property Damage
☐ 115 Legal Malpractice
☐ 115 Malpractice – Other professional
☐ 117 Premises Liability
☐ 118 Slander/Libel/Defamation
☐ 116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**

☐ 121 Physician M.D.   ☐ 123 Hospital
☐ 122 Physician D.O.   ☐ 124 Other

Case No._____

## 130 CONTRACTS:

☐131 Account (Open or Stated)
☐132 Promissory Note
☐133 Foreclosure
☐138 Buyer-Plaintiff
☐139 Fraud
☐134 Other Contract (i.e. Breach of Contract)
☐135 Excess Proceeds-Sale
☐Construction Defects (Residential/Commercial)
　　　☐136 Six to Nineteen Structures
　　　☐137 Twenty or More Structures

## 150-199 OTHER CIVIL CASE TYPES:

☐156 Eminent Domain/Condemnation
☐151 Eviction Actions (Forcible and Special Detainers)
☐152 Change of Name
☐153 Transcript of Judgment
☐154 Foreign Judgment
☐158 Quiet Title
☐160 Forfeiture
☐175 Election Challenge
☐179 NCC-Employer Sanction Action
　　　(A.R.S. §23-212)
☐180 Injunction against Workplace Harassment
☐181 Injunction against Harassment
☐182 Civil Penalty
☐186 Water Rights (Not General Stream Adjudication)
☐187 Real Property
☐ Special Action against Lower Courts
　　　(See lower court appeal cover sheet in Maricopa)

☐194 Immigration Enforcement Challenge
　　　(§§1-501, 1-502, 11-1051)

## 150-199 UNCLASSIFIED CIVIL:

☐ Administrative Review
　　　(See lower court appeal cover sheet in Maricopa)
☐150 Tax Appeal
　　　(All other tax matters must be filed in the AZ Tax
　　　Court)
☐155 Declaratory Judgment
☐157 Habeas Corpus
☐184 Landlord Tenant Dispute- Other
☐190 Declaration of Factual Innocence
　　　(A.R.S. §12-771)
☐191 Declaration of Factual Improper Party Status
☐193 Vulnerable Adult (A.R.S. §46-451)
☐165 Tribal Judgment
☐167 Structured Settlement (A.R.S. §12-2901)
☐169 Attorney Conservatorships (State Bar)
☐170 Unauthorized Practice of Law (State Bar)
☐171 Out-of-State Deposition for Foreign Jurisdiction
☐172 Secure Attendance of Prisoner
☐173 Assurance of Discontinuance
☐174 In-State Deposition for Foreign Jurisdiction
☐176 Eminent Domain-- Light Rail Only
☐177 Interpleader-- Automobile Only
☐178 Delayed Birth Certificate (A.R.S. §36-333.03)
☐183 Employment Dispute- Discrimination
☐185 Employment Dispute-Other
☐195(a) Amendment of Marriage License
☐195(b) Amendment of Birth Certificate
☒163 Other Discrimination and Retaliation under Title VII
　　　(Specify)

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

☐Antitrust/Trade Regulation
☐Construction Defect with many parties or structures
☐Mass Tort
☐Securities Litigation with many parties
☐Environmental Toxic Tort with many parties
☐Class Action Claims
☐Insurance Coverage Claims arising from the above-listed case types
☐A Complex Case as defined by Rule 8(i) ARCP

**Additional Plaintiff(s)**

_____

_____

**Additional Defendant(s)**

Robert Page Jr. and Jane Doe Page, and Mark Searle and Jane Doe Searle.

_____

EXHIBIT 3

MICHAEL K. JEANES, CLERK
BY
*P. Shepardson*
T. SHEPARDSON, FILED

16 SEP -2 PM 4: 49

1  Michelle R. Matheson #019568
   **MATHESON & MATHESON, P.L.C.**
2  15300 North 90th Street
   Suite 550
3  Scottsdale, Arizona 85260
   (480) 889-8951
4  mmatheson@mathesonlegal.com
   **E-Service:** reception@mathesonlegal.com
5  Attorney for Plaintiff

6              **SUPERIOR COURT STATE OF ARIZONA**

7             **IN AND FOR THE COUNTY OF MARICOPA**

8

9  Nicholas Alozie, a single man,                    Case No.:

10                  Plaintiff,                        CV2016-054324

11

12 vs.                                               **CERTIFICATE REGARDING**
                                                     **COMPULSORY ARBITRATION**
13 Arizona Board of Regents, a political
   subdivision of the state of Arizona, and
14 Arizona State University, a public
   university, et al.,
15

16                  Defendants.

17         The undersigned certifies that he knows the dollar limits and any other limitations

18 set forth by the local rules of practice for the applicable superior court, and further certifies

19 that this case <u>is not</u> within the jurisdictional limit for compulsory arbitration and <u>is not</u>

20 subject to compulsory arbitration, as provided by Rules 72 through 76 of the Arizona Rules

21 of Civil Procedure.

22 DATED this 2nd day of September 2016.

23
                                        **MATHESON & MATHESON, P.L.C.**
24

25                                      By: *Michelle R. Matheson*

26                                          Michelle R. Matheson, #019568
                                            *Attorney for Plaintiff*
27

28