**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nicholas Alozie,<br><br>    Plaintiff,<br><br>v.<br><br>Arizona Board of Regents, et al.,<br><br>    Defendants. | No. CV-16-03944-PHX-ROS<br><br>**ORDER** |

      Plaintiff Nicholas Alozie believes Defendants have a policy of appointing individuals serving as interim deans to permanent dean positions. Alozie believes that policy has a disparate impact on African-Americans. The Court previously dismissed Alozie's attempts to base a disparate impact claim on this alleged policy because he did not allege sufficient facts supporting the claim. Alozie now seeks to amend his complaint to reallege a disparate impact claim. The proposed amended complaint and the attached documents establish the policy has been applied so few times that the numbers do not give rise to a plausible inference of discrimination. Therefore, the request to amend the complaint will be denied.

## BACKGROUND

      In his original complaint Alozie alleged "[o]ver the past twelve years, all or nearly all times that ASU appointed an individual to an 'interim' [dean] position it subsequently selected that individual for the permanent [dean] position. And the individuals who ASU selected for such positions were all, or nearly all, Caucasian." (Doc. 1-1 at 13). In

resolving a motion to dismiss, the Court concluded the alleged "interim to permanent" policy was a viable basis for a disparate impact claim but the Court held Alozie would need to allege "the number of permanent dean positions at issue." (Doc. 17 at 13). The Court noted that if the total number of permanent dean positions was "very low," application of the facially neutral policy might "not raise a plausible inference of disparate impact discrimination."

Alozie amended his complaint to allege Defendants had used the "interim to permanent" policy to award "[a]t least 10 dean positions" to Caucasians and "discovery in this case [would] reveal additional instances." (Doc. 22 at 13). In granting a motion for judgment on the pleadings, the Court again concluded Alozie had not provided enough factual support for the disparate impact claim. Despite alleging the policy had been applied ten times to promote Caucasians, Alozie had not alleged the total number of times the policy had been applied. And as the Court explained at that time, "[t]he only way to meaningfully evaluate the plausibility of the disparate impact claim is to know, at the very least, the total number of positions filled pursuant to the policy." (Doc. 42 at 5). Alozie was again granted leave to amend.

On June 2, 2018, Alozie filed the now-pending motion to amend his complaint. According to the proposed amended complaint and the documents attached to it, since 2008 Defendants have made "42 total appointments to dean or interim dean positions." (Doc. 59-1 at 2). Of those appointments, 29 were permanent dean appointments, meaning 13 were interim dean appointments. Thus, there were 13 instances where an interim dean was in place at the time Defendants filled a permanent dean position. Of those 13 instances, the interim dean was chosen as the permanent dean six times while the interim dean was not chosen as the permanent dean seven times.[1] The question now

---

[1] Alozie has presented slightly different numbers. In his motion, Alozie claims nine individuals were appointed as interim deans and later appointed as permanent deans. (Doc. 59 at 2). In his proposed amended complaint, Alozie alleges there were eleven instances of interim deans being appointed as permanent deans. (Doc. 59-3 at 15). And in his reply in support of his motion to amend, Alozie argues ten interim deans were later appointed as permanent deans. (Doc. 65 at 2). Alozie has not explained these discrepancies. Regardless, Alozie attached Defendants' discovery responses to his proposed amended complaint. Those responses show the correct numbers are 13 interim

is whether these numbers are sufficient to support a disparate impact claim.[2]

## ANALYSIS

"Leave to amend a party's pleading pursuant to Rule 15(a) of the Federal Rules of Civil Procedure should [be] freely give[n] . . . when justice so requires." *Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649 F.3d 1143, 1152 (9th Cir. 2011). But leave to amend "may be denied if the proposed amendment . . . lacks merit." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1144 (9th Cir. 2015).

Here, the proposed amended complaint and the attached documents establish Defendants applied the "interim to permanent" policy six times during the past decade. The relevant question is whether application of an alleged policy to six hiring decisions over a ten-year period is a sufficient basis for a disparate impact claim. It is not.

A disparate impact claim is usually established by "statistical disparities . . . sufficiently substantial that they raise . . . an inference of causation." *Shutt v. Sandoz Crop Protection Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991). But "statistical evidence derived from an extremely small universe . . . has little predictive value and must be disregarded." *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1076 (9th Cir. 1986). The Ninth Circuit has deemed statistics to be of little value when the relevant group of employees consisted of three, four, eight, 11, 28, 38, and 57 individuals.[3]

---

deans with six of those individuals being appointed as permanent deans. (Doc. 59-1 at 2). The Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998). Accordingly, the Court uses the numbers established by Defendants' discovery responses.

[2] Alozie originally alleged "all or nearly all times" an interim dean was in place that interim dean was selected to fill the permanent dean position. Later, Alozie alleged Defendants had used the "interim to dean" policy to fill at least ten positions and discovery would uncover additional instances. The Court allowed discovery but Alozie was not able to uncover even the ten instances he alleged. And now, according to the documents Alozie attached to his proposed amended complaint, over the past decade Defendants have appointed 13 interim deans and in more than half of those situations (seven out of 13), Defendants *did not* appoint the interim dean as the permanent dean. In light of these facts, it is unclear how Alozie had a good faith basis for his earlier allegations.

[3] *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1100 (9th Cir. 2005) (group of three was "too small a sample to constitute meaningful statistical evidence"); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 663 (9th Cir. 2002) (group of four employees was too small to be instructive); *Morita v. S. California Permanente Med.*

Alozie's allegations of six applications of the policy falls on the extreme end of this spectrum such that the numbers do not give rise to any plausible inference of discrimination.

Application of the "interim to permanent" policy to six hiring decisions over the course of ten years makes any statistical analysis essentially meaningless. But the situation is even worse for Alozie because Defendants only have records for two instances where the policy was applied. Thus, there is not even complete information regarding the very few instances where the policy was applied. And a brief analysis of the two instances where records exist shows the folly of attempting to base a disparate impact on such a small universe of facts.

The records establish 58 individuals applied for the two permanent dean positions. One of those positions was the position Alozie sought. Alozie has not identified the race of the other applicants. Thus, the only information is that Alozie was an African-American applicant and all other applicants *might* have been Caucasian. Under that assumption, African-Americans comprised 1.7% (1 out of 58) of the applicant pool while Caucasians comprised 98.2% (57 out of 58). Defendants' application of the "interim to permanent" policy resulted in 2 Caucasians and 0 African-American being appointed as permanent deans. Thus, the policy resulted in a selection rate of 3.4% for Caucasians (2 Caucasians out of 58 applicants) and a selection rate of 0% for African-Americans (0 African-Americans out of 58 applicants). In these circumstances, a difference in selection rate of only 3.4% is not sufficient to support a disparate impact claim.[4] *See*

---

*Grp.*, 541 F.2d 217, 220 (9th Cir. 1976) (group of 8 employees was "much too small to have significant benefit" to the plaintiff's claim); *Shutt v. Sandoz Crop Protection Corp.*, 944 F.2d 1431, 1433 (group of 11 was "so small that it [did] not establish a statistical pattern"); *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1076 (9th Cir. 1986) (group of 28 employees was "too small" to generate useable statistics); *Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) (pool of 38 applicants was "likely too small to produce statistically significant results"); *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1272-73 (9th Cir.1981) (pool of 57 test-takers produced statistics of limited value).

[4] Alozie offers his own statistical analysis but that analysis is based on inexplicable assumptions. According to Alozie, the 0% selection rate for African-Americans as permanent deans should be compared to the racial composition of three possible applicant pools: 1) "ASU's black student population" of 3.8-4.9%; 2) "ASU's black employee population" of 3-3.5%; or 3) the "13.3% of the [general] population [that] is African

*Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) (noting a "2.5 percent difference is not a substantial or significant statistical disparity").

The impossibility of meaningful statistical analysis is further illustrated by the fact that one different hiring decision would have produced starkly different results. Using the same numbers as outlined above, if Alozie had been selected as interim dean and then chosen as permanent dean, African-Americans would have had a selection rate of 100% while Caucasians would have had a selection rate of 1.7% (1 selection out of 58 applicants). Disparate impact liability is inappropriate where the statistics change so dramatically based on a single decision.[5] *Stout*, 276 F.3d at 1124 n.3. (disparate impact liability should not "turn on such statistical caprice").

Alozie has alleged a policy that has been used so few times that the resulting hiring pattern provides insufficient support for his disparate impact claim. In light of the very few instances during the past decade where the alleged policy has been applied, Alozie will not be able to state a plausible claim for disparate impact. Therefore, it would be futile to allow him to amend.

---

American." (Doc. 65 at 4). It should be obvious that students at ASU do not make up the relevant applicant pool for appointments as academic deans. Similarly, it should be obvious that the general ASU employee pool or all African-Americans in the United States do not make up the applicant pool for specialized positions such as academic deans. The relevant applicant pools would be those with the high-level qualifications necessary for appointment as permanent deans, such as those holding a Ph.D. in the relevant field. Alozie has not alleged any facts regarding relevant applicant pools. Alozie's invocation of completely irrelevant applicant pools is not helpful. *See Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) ("Generally, the appropriate population is the applicant pool or relevant labor market from which the positions at issue are filled.").

[5] Yet more support for rejecting the statistical analysis is found in the "rule of thumb" known as the "four-fifths rule." *Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002). That rule, suggested by the Equal Employment Opportunity Commission, "states that a selection practice is considered to have a disparate impact if it has a selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate of the group with the highest rate." *Id.* The EEOC has cautioned, however, that the rule should not be applied where a change in one selection choice would drastically alter the results. As stated by the EEOC, disparate impact liability generally is not appropriate "where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group." *Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures*, 44 Fed. Reg. 11,996, 11999 (1979).

Accordingly,

**IT IS ORDERED** the Motion to Amend (Doc. 59) is **DENIED**.

Dated this 30th day of July, 2018.

Honorable Roslyn O. Silver
Senior United States District Judge