# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nicholas Alozie, | No. CV-16-03944-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Board of Regents, et al., | |
| Defendants. | |

Plaintiff Nicholas Alozie ("Alozie") is a professor at Defendant Arizona State University, a public university which is governed by Defendant Arizona Board of Regents (collectively, "ASU").[1] Alozie and three other candidates applied for the position of Dean of the College of Letters and Sciences and were interviewed. At his interview, Alozie handed the search committee, which was chaired by Defendant Marlene Tromp ("Tromp"), a written statement. Alozie and one other candidate were not granted second interviews. The two other candidates were granted second interviews, and one of those candidates was ultimately selected as the Dean of the College of Letters and Sciences. Alozie argues this outcome was based on his race and/or national origin, and in retaliation for his written statement. At present, Alozie has two Title VII claims against ASU: (1) race and/or national origin discrimination as to Alozie's nonselection as Dean and the decision not to grant him a second interview; and (2) retaliation as to the decision not to grant Alozie a second

---

[1] Arizona State University is a non-jural governmental entity; the Arizona Board of Regents is the entity subject to suit pursuant to A.R.S. § 15-1625(B)(3). *Krist v. Arizona*, No. CV17-2524 PHX DGC, 2018 WL 1570260, at *2 (D. Ariz. Mar. 30, 2018)

interview. Alozie also has a Section 1983 claim against Tromp in her personal capacity for a violation of the First Amendment. ASU and Tromp now move for summary judgment on each of these claims. For the reasons set forth below, ASU's motion will be granted in part and denied in part, and Tromp's motion will be granted.

## BACKGROUND

Unless otherwise noted, the following facts are either undisputed or taken in the light most favorable to Alozie, the non-moving party.[2] Alozie is a professor at ASU, and has been the head of the Social Science Department at the Polytechnic campus since 2005. (Doc. 22 at 5.[3]) Prior to 2014, the Social Science Department was part of the School of Letters and Sciences ("SLS"), which was led by a Director, Dr. Frederick Corey, who also served as the Dean of University College. (Doc. 22 at 5; Doc. 137 at 2.) In early 2014, when Dr. Corey left his positions, Dr. Robert Page ("Page"), the ASU Provost, appointed Dr. Duane Roen ("Roen"), an English professor and the Assistant Vice Provost for University Academic Success Programs, to be the Interim Director of SLS and Interim Dean of University College. (Doc. 137 at 3; Doc. 146-1 at 6, 9.)

In May 2014, Page decided to change the *School* of Letters and Sciences into the *College* of Letters and Sciences ("CLS"), which would be governed by a Dean rather than a Director. (Doc. 137 at 3–4; Doc. 22 at 6.) Roen's title accordingly changed to Interim Dean of CLS. (Doc. 137 at 5.) In July 2014, Roen addressed a group of faculty leaders in CLS. (Doc. 137 at 4.) The parties dispute the contents of Roen's statement. Alozie claims Roen announced that the University had agreed to give the Dean position to Roen but would announce a search to fill the position nevertheless; in other words, in Alozie's view

---

[2] Alozie disputes many facts, and raises objections to many others. The Court disregards those disputed facts which are immaterial to resolving these motions. The Court also disregards the arguments, framed as disputes, which are presented in the controverting statement of facts in violation of Local Rule of Civil Procedure 56.1(b). *Breeser v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150, 1154–55 (D. Ariz. 2013) (parties may not include explanations, inferences, or arguments supporting their position in the response to the statement of facts, because "[o]pinion, suggested inferences, legal arguments and conclusions are not the proper subject matter of a Local Rule 56.1 statement," and it is "wholly improper, redundant, unpersuasive and irksome" to include them) (quoting *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012)).
[3] All page numbers refer to the ECF header.

Roen announced the outcome of the search was pre-determined. (Doc. 137 at 4–5; Doc. 141 at 9–10.) Roen claims he announced two things: first, the University was going to start the process for finding a permanent dean; and second, Roen believed that in light of prior appointments, there was a strong likelihood that he would be selected as the permanent dean. (Doc. 137 at 4–5; Doc. 137-1 at 5–6, 80.)

On August 20, 2014, the faculty of CLS were emailed an announcement of the internal search for a permanent Dean and a request for nominations and volunteers to serve on the search committee. (Doc. 137 at 5; Doc. 137-1 at 102.) Dr. Barry Ritchie ("Ritchie"), the Vice Provost for Academic Personnel at the time, was the Provost's office liaison to the search committee. (Doc. 137 at 5; Doc. 137-1 at 102.) Tromp, the Dean of the New College of Interdisciplinary Arts and Sciences and Vice Provost of West Campus, was the chair of the search committee, which ultimately consisted of fourteen other people. (Doc. 137 at 5–6.) One member of the search committee was Patience Akpan-Obong, who worked under Alozie's direct supervision as a faculty member in his unit and who Alozie asked to serve on the committee. (Doc. 137 at 6.) Another member of the search committee was Oscar Jiminez-Castellanos, who was a representative of the faculty Senate, as required by ASU policy. (Doc. 137 at 6; Doc. 137-1 at 95; Doc. 141-1 at 102.)

At ASU, decisions regarding the appointment of deans are made by the Provost (Page), subject to the approval of the President (Dr. Michael Crow ("Crow")). (Doc. 137 at 1.) The search committee met on October 10, 2014, and Ritchie charged the committee to identify a small number of candidates and to provide a recommendation to Page and Crow. (Doc. 137 at 6; Doc. 141-1 at 104.) At the October 10, 2014 meeting, and via email after the meeting, the search committee discussed the qualifications for the CLS Dean position. (Doc. 137 at 7.) On October 22, 2014, the job announcement for the CLS Dean position was sent out by email. (Doc. 137 at 7.) The job announcement listed the responsibilities of the position, including "will provide academic and administrative leadership" and "must be committed to working with the provost, the other deans, faculty heads, and the faculty" of various programs on multiple campuses "to achieve university

academic goals for excellence in research and learning, and to further goals for inclusion and impact." (Doc. 137 at 7; Doc. 137-1 at 106.)

The job announcement listed five required qualifications and four desired qualifications. (Doc. 137 at 7; Doc. 137-1 at 107.) Each candidate was required to be "a tenured full professor at Arizona State University" who "exhibit[ed] leadership and strategic vision" and had, among other qualifications, an "excellent record of scholarship," "demonstrated administrative skills," and a "commitment to ASU's values, goals, and mission." (Doc. 137 at 7; Doc. 137-1 at 107.)

The search committee received four applications for the position: Roen; Dr. Fabio Milner ("Milner"), a Professor of Mathematics and the Director of Mathematics for STEM Education; Dr. Joseph Carter ("Carter"), Associate Dean of ASU's W.P. Carey School of Business; and Alozie. (Doc. 137 at 8.) Roen and Carter are Caucasian; Milner is Latino; and Alozie is African-American, with Nigerian national origin. (Doc. 22 at 14; Doc. 141 at 17, 24; Doc. 141-1 at 24.) The search committee determined all four applicants met the required qualifications and invited them all for initial interviews. (Doc. 137 at 9.)

On December 1, 2014, the search committee interviewed the four candidates. (Doc. 137 at 9.) The search committee prepared a set of approximately ten general interview questions, which were asked of all candidates, and two specific questions for each individual candidate. (Doc. 137 at 9; Doc. 137-2 at 9; Doc. 141-1 at 24.) Alozie brought a written statement to the interview that he planned on reading to the search committee; he said he wanted the written statement to be part of the process and handed out copies of the statement to members of the committee. (Doc. 137 at 9.) Tromp informed Alozie that, in the interest of treating all the candidates the same, Alozie's interview would be centered around the prepared questions. (Doc. 137 at 9; Doc. 137-1 at 10, 30; Doc. 141 at 19.) Thus, Alozie did not read his statement aloud. (Doc. 137-1 at 10.) The statement is five pages long and is entitled "Opening Statement to the Dean's Search Committee." (Doc. 137-1 at 199–203.) The first few pages of the statement read as follows:

Good Afternoon:
Thank you for the invitation to meet with you. This is a very special

- 4 -

day in the history of ASU, and I will tell you why.

In the 24 years I have been at ASU, I have worn two hats. The first hat is that of a faculty member working, just like everyone else, to build a career and to contribute to the well-being of students and the institution. The second hat is that of a community diversity leader helping to build an environment conducive for women and minority scholars to succeed at ASU. I would say I have been very successful at both.

The latter hat led me to the position of chairperson of the ASU Black Caucus, where only a few years back and among other issues, I worked with Milt Glick, our former provost, and other top ASU officials to close **the "Revolving Door" of minority scholars leaving ASU as quickly as they arrived because they didn't think the environment was favorable enough to warrant their staying at ASU. The complaint among young minority faculty was that ASU was simply a stopover and for a rewarding career with advancement they had to move on to another university. They never saw ASU as a place to build a career.**

The fact that as a homegrown product of ASU having advanced through the ranks at ASU to head a faculty unit for nine years continuously, I am sitting before you here today to compete for the position of Dean at ASU is historic. That is what makes this a very special day. Traditionally, ASU is one of those places where we scramble to get minority scholars from outside to apply for these kinds of positions. If Provost Glick were here today, he would be proud of this milestone for ASU, although there are not many colleges at the university where the same success can be observed.

Having said that, I must confess that the decision to apply for this position was a difficult one for me. The circumstances of my application may offend some people and may even lead to a blowback. This is why my application came in at the very last minute. I had to carefully consider the decision to indicate my interest in this position.

**Indeed, the word in the College is that there is really no vacancy here, that this Dean's position has already been promised and that the university is simply going through the motions to dot its i's and cross its t's with this hiring process. Thus, I am expected, just like everyone else in the college, to back off and let the impending coronation take place.**

(Doc. 137-1 at 199–201) (emphases added in bold). The remainder of the statement discusses Alozie's reasons for applying to the position ("I am well qualified for this position as per the stated requirements" and "I have devoted the better part of my adult life working to create a level playing field for women and minorities"); the nature of the Dean's position; Alozie's history at ASU; and a closing statement. (Doc. 137-1 at 201–203.)

At the time of the December 1, 2014 interviews, Alozie thought the search process

was a sham process. (Doc. 137 at 10.) Alozie based this thinking on his understanding of Roen's July 2014 statement to the CLS leadership group regarding Roen's eventual appointment as the permanent Dean. (Doc. 141 at 21; Doc. 137 at 4–5.)

After the interviews, the search committee discussed each of the candidates and voted in favor of advancing Roen and Milner to the second round of interviews on campus. (Doc. 137 at 11.) The search committee also discussed Alozie's accusation in his written statement that "the word in the College is that there is really no vacancy here, that this Dean's position has already been promised and that the university is simply going through the motions to dot its i's and cross its t's with this hiring process." (Doc. 137 at 11; Doc. 141 at 25.) In the course of the discussion, the evidence indicates that at least three members of the search committee felt that Alozie was attacking the integrity of the search committee. (Doc. 137-1 at 206, 218; Doc. 137-2 at 6.) A small minority of the committee, including Patience Akpan-Obong and Oscar Jimenez-Castellanos, supported inviting Alozie to a second interview, while the remaining members of the search committee did not, and the parties dispute whether the committee had reached a *final* decision on inviting Alozie to a second interview before the meeting adjourned. (Doc. 137 at 11–12; Doc. 141 at 23–25.) After the discussion, Tromp said she would speak with the Provost's office. (Doc. 137 at 12.)

After the meeting adjourned, on December 1, 2014, at 6:17 p.m., Tromp sent Ritchie an email that said, "I have a quick (but thorny) question about the Dean search for you" and left a call-back number. (Doc. 137 at 12; Doc. 137-2 at 27.) Tromp wanted to talk to Ritchie about the concerns that had been raised and to ask him what the appropriate next steps would be, and to relate what happened at the committee meeting. (Doc. 137 at 13.) Tromp and Ritchie spoke by phone later that evening, and Tromp told Ritchie that Alozie had submitted an opening statement at his interview and made an allegation that the committee was biased, and Tromp was upset because she felt her integrity had been impugned. (Doc. 137 at 13.) It appears the "bias" at issue was Alozie's concern that Roen had already been selected for the position. (Doc. 137-1 at 72; Doc. 141 at 28.) That is, there

is no indication that Tromp's concerns stemmed from Alozie's allegations regarding racial discrimination. Ritchie told Tromp that she should focus on her job as chair of the search committee, that the goal of the interview was to gather information relating to the decision to be made, and the committee had done that. (Doc. 137 at 13.) He also told her that the slate of candidates and the process seemed fine, and that there were other processes for the kind of concerns that Alozie raised. (Doc. 137 at 13.)

The following morning, on December 2, 2014, Tromp sent Alozie an email thanking him for the time and energy he invested in the search process but informing him that the CLS Dean search committee "felt the college needed different leadership for its next phase of development." (Doc. 137 at 13; Doc. 137-2 at 29.) Alozie understood he was no longer in the running for the CLS Dean position, and was shocked, surprised, and felt "some anger." (Doc. 137 at 13; Doc. 137-1 at 12.) Tromp sent a similar email to Carter. (Doc. 137 at 13–14; Doc. 137-2 at 31.) But Tromp sent emails to Roen and Milner inviting them to move forward in the CLS Dean search process with campus interviews. (Doc. 137 at 14; Doc. 137-2 at 33, 35.)

Members of the search committee served as hosts and moderators of the campus interviews, which took place on December 3 and 5, 2014, and involved directors and chairs, faculty and students. (Doc. 137 at 14.) On December 12, 2014, the search committee met and discussed the weaknesses and strengths of Roen and Milner, which Tromp summarized in a memo. (Doc. 137 at 14.) On December 13, 2014, Tromp sent Page an email saying she wanted to speak to him to share some things that did not belong in her report; the two spoke at commencement and Tromp expressed her belief that ASU would be best served by relaunching the search and conducting an external search. (Doc. 137 at 14; Doc. 137-1 at 29.) After the conversation with Page at commencement, Tromp had no further discussions regarding the Dean search with either Page or Crow. (Doc. 137 at 15.)

On December 20, 2014, Tromp emailed Page her Dean Search Memo summarizing the strengths and weaknesses of Roen and Milner, noting "Dr. Milner seemed more likely to strive to achieve the college's goals by working through attention to *faculty* and faculty

research and Dr. Roen through attention to *students*," and concluding that both were capable of doing the job. (Doc. 137 at 15; Doc. 137-2 at 39–42.) On January 14, 2015, Page offered Roen the position of Dean of CLS. (Doc. 137 at 15.)

In March 2015, Alozie met with Erin Ellison, a senior Equal Opportunity consultant with ASU's Office of Equity and Inclusion. (Doc. 137-1 at 14; Doc. 141-2 at 5.) Ms. Ellison investigated, interviewing several members of the search committee, and issued a report to Searle on October 8, 2015 concluding that Alozie's statement "was not the primary reason why [Alozie] did not move onto the final interview." (Doc. 141-1 at 27.) Alozie also filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in August 2015. (Doc. 137 at 15.) The EEOC conducted an investigation and issued a determination on June 10, 2016 stating "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that [ASU] is in compliance with the statutes." (Doc. 137 at 15; Doc. 137-2 at 44.) Alozie timely filed his complaint in Arizona Superior Court, which was removed to this Court under 28 U.S.C. § 1441(a).

After the Court dismissed certain claims and the parties stipulated to dismiss certain defendants and limit other claims, Alozie is still pursuing three claims: (1) ASU discriminated against Alozie due to his race and/or national origin by not granting Alozie a second interview and not selecting him for the position of Dean of CLS , in violation of Title VII; (2) ASU retaliated against Alozie for submitting his opening statement to the search committee by not granting Alozie a second interview, in violation of Title VII; and (3) Tromp retaliated against Alozie for submitting his opening statement to the search committee by not selecting Alozie for the position of Dean of CLS, in violation of the First Amendment. (Doc. 22; Doc. 117.)

ASU seeks summary judgment on Alozie's Title VII claims, arguing Alozie lacks evidence that the refusal to offer a second interview or hire him as dean was based on his race or national origin, or as retaliation for his written statement. (Doc. 135.) Tromp seeks summary judgment on Alozie's First Amendment claim, arguing she is entitled to qualified

immunity. (Doc. 136.)

## ANALYSIS

### I.    Standard for Summary Judgment

The moving party is entitled to summary judgment if the evidence, viewed in the light most favorable to the non-moving party, shows "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004); *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). At summary judgment, the court cannot weigh the evidence nor make credibility determinations. *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005). The moving party initially bears the burden of proving the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986). To do so, "[t]he moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Regarding the evidence, the district court "need consider only the cited materials." Fed. R. Civ. P 56(c)(3). Thus, "where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found" "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact." *Wyatt Tech. Corp. v. Smithson*, 345 F. App'x 236, 239 (9th Cir. 2009) (quoting *Carmen v. San Fran. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)). That said, the district court may consider materials in the record not cited by the parties. Fed. R. Civ. P 56(c)(3).

### II.    ASU's Motion for Summary Judgment

ASU moves for summary judgment on both of Alozie's Title VII claims: (1) race or national origin discrimination; and (2) retaliation. Each is discussed separately.

#### A.  Race or National Origin Discrimination

Under Title VII an employer may not "discriminate against an individual with

respect to his . . . terms, conditions, or privileges of employment" because of his race or national origin. 42 U.S.C. § 2000e-2(a). Alozie originally alleged he had been discriminated against because of race and/or national origin. However, the parties' summary judgment filings do not address "national origin" separately. In fact, Alozie's opposition to the motion for summary judgment does not even use the phrase "national origin." Therefore, the Court will analyze Alozie's Title VII discrimination claim based solely on race.

To survive summary judgment on a race discrimination claim, Alozie must "create a triable issue of fact regarding discriminatory intent." *Habib v. Matson Navigation Co., Inc.*, 694 F. App'x 499, 500–01 (9th Cir. 2017) (citing *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013)). To do so, Alozie may rely on the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4]

Under the *McDonnell Douglas* framework, Alozie must first establish a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). ASU does not dispute that Alozie met this burden, because he belongs to a protected class; he applied for a position for which he met the minimum qualifications; he was rejected for the position when he was eliminated from consideration after the first round of interviews; and ASU filled the position with an employee not of Alozie's class. *See Dominguez-Curry*, 424 F.3d at 1037 (fourth element of McDonnell Douglas framework may be met in two ways, when "the employer filled the position with an employee not of plaintiff's class, or continued to consider other applicants whose qualifications were comparable to plaintiff's after rejecting plaintiff"); Doc. 135 at 7.

_____

[4] Alozie claims he does not need to rely on the *McDonnell Douglas* framework to survive summary judgment. (Doc. 143 at 10). But it is simplest to employ the *McDonnell Douglas* framework. Ultimately, the inquiries under the *McDonnell Douglas* framework and the more straightforward approach are often the same. And here, Alozie has no evidence establishing a dispute of fact regarding intentional discrimination regardless of the approach taken. *Cf. McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004) (noting district court's reliance on *McDonnell Douglas* was "not particularly significant" because the important inquiry was whether plaintiff had presented sufficient evidence of discriminatory intent).

Having conceded Alozie can establish a prima facie case, the burden shifted to ASU to articulate a legitimate, nondiscriminatory reason for not granting Alozie a second interview and not selecting Alozie for the position of Dean of CLS. *McDonnell Douglas*, 411 U.S. at 802. ASU explains Alozie "was eliminated because other candidates were better qualified." (Doc. 135 at 7.) Specifically, ASU focuses on the candidates' administrative experience, noting that while Alozie had served as a Faculty Head, Alozie's unit was small, while Roen "served as Assistant Vice Provost for University Academic Success Programs, Director of the Center for Learning and Teaching Excellence, Director of English Composition, and Faculty Head of numerous faculty units." (Doc. 135 at 7–8; Doc. 146-1.) Alozie "objected to and disputed" this in his Response to the Statement of Facts, but the applicant whose qualifications Alozie challenged was Milner, not Roen. (Doc. 143 at 11; Doc. 141 at 18, 21–23.) In fact, Alozie admits he "does not contend that Roen was an unqualified candidate."[5] (Doc. 141 at 21.) Alozie does not dispute the qualifications held by Roen, Milner, and himself; rather, he challenges how those qualifications should have been weighed. (Doc. 143 at 7; Doc. 141-1 at 3.)

There is no issue of material fact as to whether ASU has articulated a legitimate, nondiscriminatory reason for not granting Alozie a second interview and not selecting Alozie for the position of Dean of CLS. The burden therefore returned to Alozie to raise a genuine factual question whether this reason is pretextual. Alozie may prove pretext in two ways: "(1) indirectly, by showing that [ASU's] proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated [ASU]." *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–22 (9th Cir. 1998)).

In his briefing, Alozie argues he has presented both direct and indirect evidence of

---

[5] Alozie contradicts this statement in his Response to ASU's Motion for Summary Judgment, where he asserts "Duane Roen's own qualifications were called into question early in the process." (Doc. 143 at 12.) But the only factual support provided for this assertion is an email reflecting uncertainty on Searle's part about Roen's courage to make tough personnel decisions. (Doc. 141 at 5; Doc. 137-1 at 52, 98.) There is no dispute as to whether Roen met the required qualifications.

pretext. (Doc. 143 at 10).[6] But that is not accurate. "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin*, 150 F.3d at 1221 (quoting *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994)) (alteration in original). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005). Alozie has not cited any evidence of "clearly . . . racist" statements or actions by ASU. *Id.* Therefore, the proper inquiry is whether Alozie has pointed to sufficient indirect evidence. To survive summary judgment by relying on indirect evidence, Alozie must point to "specific and substantial" indirect evidence. *Id.* Alozie cites ten alleged pieces of indirect evidence. (Doc. 143 at 9). But that evidence, even viewed cumulatively, is not sufficient.

Alozie's first indirect evidence is that Roen was preselected for the Dean position when he was appointed as interim Dean. (Doc. 143 at 9, 13.) But Roen was only one of two candidates who were recommended to the Provost and President as equally capable of doing the job of CLS Dean. (Doc. 137 at 15; Doc. 137-2 at 42.) And "only preselection *based on discriminatory motives* violates Title VII." *Blue v. Widnall*, 162 F.3d 541, 547 (9th Cir. 1998) (emphasis added). Alozie presents no factual evidence either that Roen's initial appointment as the interim Dean, or that the selection of Roen as permanent Dean (as between the two final candidates of Roen and Milner, who is Latino) occurred because of Roen's race.

Alozie next cites his "early exclusion . . . based solely on an 'impression.'" (Doc. 143 at 9.) He appears to be referring to the fact that his name, along with the names of three other full professors in CLS, most of whom are white, was included in a list Searle sent to Page of individuals who might not be a good fit for the Dean position. (Doc. 137 at 8; Doc. 137-1 at 110; Doc. 141 at 16.) Alozie presents no factual evidence that his name's presence on a list that included members of multiple races, followed by the acceptance of his

---

[6] Alozie uses the term "circumstantial evidence," which is used interchangeably with "indirect evidence." *Compare Chuang*, 225 F.3d at 1127 (using term "indirect evidence") *with Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005) (using term "circumstantial evidence").

application and the grant of an initial interview, constituted exclusion based on Alozie's race.

Third, Alozie cites a "lack of contemporaneous documentation by the committee" that Alozie's qualifications were an issue. (Doc. 143 at 9.) But at least one member of the search committee kept detailed notes regarding the discussion of the candidates' qualifications at the November 21, 2014 search committee meeting. (Doc. 141-1 at 105–106.) In those contemporaneous notes, the candidates were directly compared on scholarship[7] (Roen had "many chapters but lack of books," Milner had "[s]trong scholarship," and Alozie had a "[w]eak scholarly record – inconsistent") and administrative/leadership experience[8] (Roen had "[s]trong administrative & multiple campuses" and was a "[w]orkhorse on behalf of college," Milner had a "[l]ack of leadership experience," and Alozie was "[w]eaker in administrative," "[n]ot easiest person to work for," and the "[p]rogram he runs has not grown"), as well as the other required and desired qualifications. (Doc. 141-1 at 105–106.) Alozie is incorrect that there was no contemporaneous documentation of the committee's concerns with his qualifications.

Fourth, fifth, and tenth, Alozie refers to awareness that Alozie was a person of color, the fact that minorities are underrepresented in academic dean positions, and ASU's stated goals of recruiting diverse candidates. (Doc. 143 at 9–10.) This does not constitute evidence of racial discrimination at all, particularly when diversity was a specific goal of the dean search and when Tromp was "very excited about [Alozie's] candidacy because [she] really wanted to see more diversity in [ASU's] leadership." (Doc. 137 at 7; Doc. 137-1 at 27, 106–107.)

Sixth and seventh, Alozie cites an "alleged 'visceral reaction' by a search committee member after Plaintiff spoke" and ASU's "pervasive 'angry black man' theme." (Doc. 143 at 9.) It is true that during her deposition Tromp described Alozie as angry when he was denied the opportunity to read his opening statement aloud to the committee. (Doc. 137 at 9; Doc. 137-1 at 30.) Alozie claims the better view of his demeanor was that of Dr. Ian

---

[7] Required qualification: "excellent record of scholarship." (Doc. 137-1 at 107.)
[8] Required qualification: "demonstrated administrative skills." (Doc. 137-1 at 107.)

Moulton, who described Alozie's tone as "forceful" and "self-assured"—but also noted that "some of the things that [Alozie] said seemed to [Moulton] to be beyond the tone of what is usually said in a job interview," such that one of the committee members responded to Alozie's tone with a "visceral reaction" that "Well, that's one person we won't be hiring." (Doc. 141 at 19; Doc. 141-1 at 91–93.) It is unclear how Tromp's individual view of Alozie as "angry" instead of "forceful," as another member of the search committee perceived Alozie, is evidence of pretext. Taken in context, this does not constitute factual indirect evidence of racial discrimination.

Eighth, Alozie cites the "refusal (approved by the administration) to grant [Alozie] a second interview after mentioning preselection and his work with minorities." (Doc. 143 at 9.) This allegation is the core of Alozie's claim, and is not independent indirect evidence of racial discrimination.

Ninth, Alozie cites Tromp's oral statement to Page that the search process should be re-started as a national search, and her written report recommending both Roen and Milner as qualified candidates. (Doc. 143 at 9.) Tromp's conclusion that a better candidate might exist elsewhere in the country, even though Roen (Caucasian) and Milner (Latino) were both qualified candidates, is not factual evidence of racial discrimination against Alozie.

Alozie believes ASU's subjective weighing of Roen, Milner, and Alozie's respective qualifications was a pretext for racial discrimination. (Doc. 143 at 9, 12–14; Doc. 141 at 18, 21–23.) But the Ninth Circuit has "explicitly rejected the idea that an employer's use of subjective employment criteria . . . 'is *per se* prohibited by Title VII,'" particularly in cases where, as here, the job being sought is a "higher level job" for which the criteria "are not easily articulable." *Casillas v. U.S. Navy*, 735 F.2d 338, 345 (9th Cir. 1984) (quoting *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1270 (9th Cir. 1980)). The mere fact that ASU considered subjective criteria when filling the high-level position of Dean of CLS is insufficient to show pretext. Contemporaneous records of the candidates' administrative qualifications reflect that Alozie was "[w]eaker in administrative" than

- 14 -

Roen.[9] (Doc. 141-1 at 105.) Alozie may have preferred ASU to evaluate administrative experience differently and as less important, but that does not raise a genuine issue of material fact that ASU's subjective qualification-weighing process was a pretext for discrimination.

Considering all of the indirect evidence cumulatively, Alozie has failed to provide "specific and substantial" indirect evidence of racial discrimination. *Coghlan*, 413 F.3d at 1095. Accordingly, summary judgment will be granted in favor of ASU on Alozie's race or national origin discrimination claim.

## B. Retaliation

To establish a prima facie case of retaliation under Title VII, Alozie must establish: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 693 (9th Cir. 2017). If Alozie establishes a prima facie case, "the burden then shifts to [ASU] to advance a legitimate, nonretaliatory reason for any adverse employment action." *Id.* If ASU meets that burden, Alozie then has the "ultimate burden" of showing that the proffered reason is pretextual. *Id.*

The first step is determining whether Alozie engaged in protected activity when he submitted his opening statement to the search committee. ASU and Alozie focus on different portions of the opening statement to support their respective arguments. ASU argues that Alozie's assertion that the "Dean's position has already been promised and that the university is simply going through the motions" does not qualify as protected activity. (Doc. 135 at 11.) Alozie asserts that his statements that he had "devoted the better part of my adult life working to create a level playing field for women and minorities" and that minority scholars "didn't think [ASU's] environment was favorable enough to warrant [the minority scholars] staying at ASU . . . that ASU was simply a stopover and for a rewarding career with advancement [the minority scholars] had to move on to another university"

_____

[9] In one of the interviews conducted in the course of the OEI investigation, one of the committee members noted that the "major reason" Alozie was not selected for a second interview was that he "did not have quite as much administrative experience as the other two candidates." (Doc. 141-2 at 2–3.)

constituted a "complain[t] about the disparate treatment of minorities in hiring decisions at ASU." (Doc. 143 at 4.)

An individual engages in protected activity under Title VII when the individual has a "reasonable belief" that the employment practice being opposed is prohibited under Title VII. *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) (collecting cases); *see also Maner v. Dignity Health*, 350 F. Supp. 3d 899, 906 (D. Ariz. 2018) ("An employee engages in protected activity for purposes of Title VII when he opposes conduct that he reasonably believes to be an unlawful employment practice."). A jury might reasonably view as protected activity Alozie's assertion that minority scholars could not achieve a "rewarding career with advancement" at ASU because the "environment was [not] favorable enough to warrant their staying at ASU." (Doc. 137-1 at 199–201.)

Alozie must then establish that he suffered adverse employment action when he did not receive a second interview. In the Ninth Circuit, "an adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1237 (9th Cir. 2000). Because Alozie stipulated that his retaliation claim was "limited to Defendant Arizona Board of Regents and Arizona State University's decision not to grant [Alozie] a second interview," ASU's "non-selection of [Alozie] for the position of Dean of the College of Letters and Sciences," which constituted a portion of Alozie's discrimination claim, is not considered as part of his retaliation claim. (Doc. 116 at 2.) In the Ninth Circuit, as well as the First, Seventh, Tenth, Eleventh, and D.C. Circuits, all of which "define adverse employment action broadly," courts disagree on whether failure to interview, without an accompanying failure to promote claim, constitutes adverse employment action for the purposes of Title VII retaliation. *Ray*, 217 F.3d at 1240; *compare Foraker v. Apollo Grp., Inc.*, 427 F. Supp. 2d 936, 942 (D. Ariz. 2006) ("failure to interview … do[es] not constitute adverse employment action[].") *with Segal v. Harris Teeter Supermarkets, Inc.*, No. CV 15-1496 (BAH), 2016 WL 7223273, at *6 n.4 (D.D.C. Dec. 13, 2016) ("[T]he D.C. Circuit has acknowledged that failure to interview may in some cases be equivalent to a failure to

promote."), *Scarborough v. Nestle Waters N. Am. Inc.*, No. CIV. 07-193-P-S, 2008 WL 4787573, at *9 (D. Me. Oct. 30, 2008), *report and recommendation adopted*, No. CIV. 07-193-P-S, 2008 WL 5236029 (D. Me. Dec. 15, 2008) ("I will focus first on the question whether a failure to interview an employee for another position may constitute adverse employment action for purposes of a Title VII claim. Available case law suggests that it is."); *see also Gray v. City of Montgomery*, No. 2:16-CV-48-WKW, 2018 WL 1748115, at *3 & n.5 (M.D. Ala. Apr. 11, 2018) (declining to consider "whether a failure to interview is an adverse employment action" because the issue was raised for the first time in the reply brief, with no supporting legal authority).

The Ninth Circuit crafted the definition of adverse employment action by declining to focus on "the ultimate effects of each employment action," concentrating instead on whether the "deterrent effects . . . effectuate[d] the letter and the purpose of Title VII." *Ray*, 217 F.3d at 1243. In accordance with that guidance, the Court finds that declining to grant an individual a second interview, when the individual engaged in protected activity during the first interview, is reasonably likely to deter employees from engaging in protected activity.

Having established that he engaged in protected activity when he submitted an opening statement asserting that minority scholars could not achieve a rewarding career at ASU, and that he suffered an adverse employment action when he did not receive a second interview, Alozie must complete his prima facie case by establishing a causal link between the opening statement and the lack of a second interview. Such a causal link "can be inferred from circumstantial evidence such as [ASU's] knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). Alozie interviewed (and submitted his opening statement) on December 1, 2014, and at 5:57 am on December 2, 2014, less than 24 hours later, Alozie was informed that he was no longer in the running for the position of CLS Dean. (Doc. 137 at 9, 13; Doc. 137-2 at 29.) This temporal proximity between the protected activity and the alleged adverse employment action,

together with evidence that members of the search committee reacted strongly to the content of the opening statement, can provide sufficient circumstantial evidence of retaliation. *Bell v. Clackamas Cty.*, 341 F.3d 858, 865 (9th Cir. 2003) (collecting cases).

The burden therefore shifted to ASU to "advance a legitimate, nonretaliatory reason" for deciding not to grant Alozie a second interview. *Reynaga*, 847 F.3d at 693. ASU asserts that the other candidates were "better qualified for the Dean position in terms of experience, understanding of the job, and possession of the skills necessary to work effectively across the university" and notes that Alozie "received scant support for a second interview." (Doc. 135 at 12–13.) For the reasons discussed in II.A, above, this is a legitimate, nonretaliatory basis for ASU's decision, and the burden returned to Alozie to show this reason is pretextual.

Because he has no "direct evidence," Alozie must provide "specific and substantial" circumstantial evidence of pretext to survive summary judgment. *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001). Alozie alleges that "[l]iterally everyone connected with the committee focused on his written statement" and that "all signs point to the fact that" Alozie was being considered for a second interview "right up until" Tromp's phone call with Ritchie. (Doc. 143 at 7.) The parties do not dispute that the committee discussed Alozie's statement, but do dispute whether the discussion focused on the content or the tone of the statement. *Compare* Doc. 137-1 at 25 (Tromp testified at 55:19–20 that "The tone of the statement was a contributing factor, not the content.") *with* Doc. 141-2 at 6 (Ian Moulton told Ms. Ellison "Alozie basically came to the interview with a statement that said he did not trust the committee members to make this judgment. It was a procedural thing at that point.") *and* Doc. 141-2 at 9 (Pamela Stewart told Ms. Ellison "she voted no because of what Nick had in his written component, which made her feel like the committee were being attacked.")

Taking the facts in the light most favorable to Alozie, the combination of the temporal proximity between the submission of Alozie's written statement and the decision not to grant him a second interview, as well as statements by members of the search

committee that they considered the content of the written statement when considering whether to grant Alozie a second interview, Alozie has provided specific and substantial circumstantial evidence sufficient to create a genuine dispute of material fact.[10] Accordingly, summary judgment on Alozie's retaliation claim will be denied.

### III.   Tromp's Motion for Summary Judgment

Tromp moves for summary judgment on Alozie's First Amendment claim on the ground that she is entitled to qualified immunity. For the following reasons, her motion will be granted.

Tromp, as a public official, is shielded by the doctrine of qualified immunity "from liability for civil damages insofar as [her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A district court may exercise discretion in determining whether to address the "constitutional right" prong or the "clearly established" prong first. *Id.* at 236.

The Court will focus on the "clearly established" prong. For Tromp to have violated Alozie's clearly established constitutional rights, "existing precedent" as of December 1, 2014 "must have placed the . . . constitutional question beyond debate." *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Any public employee pursuing a First Amendment retaliation claim in the Ninth Circuit must proceed through a "sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action

---

[10] There is confusion in the record regarding which portion of Alozie's statement was cause for concern. The committee was free, of course, to take action based on the *unprotected* portion of Alozie's statement. However, taking the facts in the light most favorable to Alozie, it is possible the committee responded to the *protected* portion of the statement.

even absent the protected speech." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).[11] The plaintiff bears the burden of the first three steps; the state bears the burden of the last two. *Id.* at 1070–72.

The Court has previously determined that Alozie's written statement regarded a matter of public concern. (Doc. 17 at 15–17.) The question then becomes whether Alozie "spoke as a private citizen or public employee." *Eng*, 552 F.3d at 1071. Normally, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *see also Lane v. Franks*, 573 U.S. 228, 238, 240 (2014) ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."). But because Alozie is a professor at a public university in the Ninth Circuit, some of his speech made pursuant to his official duties will qualify as "academic speech" that receives additional protection. "[T]eaching and academic writing that [is] performed 'pursuant to the official duties' of a teacher and professor" is "academic employee speech not covered by *Garcetti* [but] protected under the First Amendment, using the analysis established in *Pickering*." *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (citing *Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563 (1968)).

Thus, there are three possibilities: (1) if Alozie's statement was not pursuant to his official duties at all, Alozie was speaking as a private citizen and the *Pickering* test applies; (2) if Alozie's statement constituted "teaching and academic writing" performed pursuant to his official duties, the *Pickering* test applies; or (3) if Alozie's statement was pursuant

---

[11] *Eng*'s modern test reflects the "dramatic[], if sometimes inconsistent[]" evolution of First Amendment retaliation law since *Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563 (1968), first set forth the original test. 552 F.3d at 1070. The original *Pickering* test had two parts: (1) "the employee must show that his or her speech addressed 'matters of public concern'"; and (2) "the employee's interest 'in commenting upon matters of public concern' must outweigh 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (quoting *Pickering*, 391 U.S. at 568).

to his official duties but did not constitute "teaching and academic writing," the *Garcetti* test applies and Alozie's speech was not protected.

To determine if Alozie was speaking as a private citizen or pursuant to his official duties, the Court must first make a factual determination as to the scope and content of Alozie's job duties, which is a "practical" inquiry, before determining the constitutional significance as a matter of law. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) (citing *Garcetti*, 547 U.S. at 421, 424). If Alozie's statement "owes its existence to [his] professional responsibilities," it was pursuant to his official duties. *Garcetti*, 547 U.S. at 421–22. Speech *pursuant to* official duties is a broader category than speech that is *part of* official duties, and *Garcetti* requires that district courts consider the former. *Lyons v. Vaught*, 875 F.3d 1168, 1174 (8th Cir. 2017); *see Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010) ("Speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description."); *Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008) (grant administration fell within scope of professor's teaching duties); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007) (written statement was pursuant to official duties because it "was part-and-parcel of [plaintiff's] concerns" about his ability to do his job).

Alozie clearly indicated in his statement that his work "to close the 'Revolving Door' of minority scholars leaving ASU . . . [because] ASU was simply a stopover and . . . [not] a place to build a career" was conducted in his role as chair of the ASU Black Caucus, a role which he took because one of his "two hats" at ASU "is that of a community diversity leader helping to build an environment conducive for women and minority scholars to succeed at ASU." (Doc. 137-1 at 199–200.) Alozie's deep knowledge about the career trajectories of minority scholars at ASU owes its existence to his professional responsibilities as a diversity leader; therefore, Alozie's statement about the "'Revolving Door' of minority scholars" was pursuant to his official duties. The Court declines to address whether statements made during job interviews for internal promotions are always

pursuant to official duties.

Having resolved that Alozie was not speaking as a private citizen, the Court must inquire whether it was clearly established on December 1, 2014 that Alozie's statement constituted academic speech under *Demers* such that it was protected, or merely constituted non-academic speech that receives no protection. Prior to "the decision in [*Demers*], [the Ninth C]ircuit ha[d] not addressed the application of *Garcetti* to teaching and academic writing." *Demers*, 746 F.3d at 417. *Demers* was the first "Ninth Circuit law on point to inform defendants about whether or how *Garcetti* might apply to a professor's academic speech," *id.*, but, "[r]ecognizing [the] limitations [of] judges," the Ninth Circuit "hesitate[d] before concluding that [the judiciary] know[s] better than the" university. *Id.* at 413.

*Demers* clearly established an exception to *Garcetti* for academic speech, but did not clearly establish what constituted academic speech. In the months between the issuance of *Demers* and Alozie's interview on December 1, 2014, only two cases substantively addressed *Demers*.

*Hodge v. Antelope Valley Cmty. Coll. Dist.* reduced the *Pickering* test to only four questions, concluding that "*Demers* . . . effectively eliminated [the official duties] inquiry with respect to public school teachers and professors' academic speech." No. CV 12-780 PSG (EX), 2014 WL 12776507, at *5 & n.4 (C.D. Cal. Feb. 14, 2014). However, the *Hodge* court did not explore the boundaries of academic speech because the speech at issue in *Hodge* was the plaintiff's words, tone, and gestures during a lecture, and a lesson plan for a future lecture, and therefore was unequivocally "teaching" under *Demers*. *Id.* at *4–*8.

*Murray v. Williams* noted that the Demers opinion "significantly shifted [First Amendment retaliation] law in employees' favor, but . . . only applies to academic speech," and did not address the issue of academic speech any further. 46 F. Supp. 3d 1045, 1060 (D. Nev. 2014). *Murray* was reversed in part by the Ninth Circuit, which found that the district court erred by concluding the speech addressed matters of public concern and held that even if the plaintiff's First Amendment rights were violated, the defendants were

entitled to qualified immunity because the rights were not clearly established. *Murray v. Williams*, 670 F. App'x 608, 609 (9th Cir. 2016) (citing *Moran v. State of Wash.*, 147 F.3d 839, 847 (9th Cir. 1998) ("Because the underlying determination pursuant to *Pickering* whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity.")).

Alozie bears the burden of proving that it was clearly established that his speech was academic, and he has not done so. *Moran*, 147 F.3d at 844. The Court holds that on December 1, 2014, it was not clearly established whether Alozie's speech during his job interview constituted academic speech for the purposes of *Demers* such that it was subject to the *Pickering* test, or whether it was non-academic speech such that it was unprotected under the *Garcetti* test.[12] Accordingly, the Court holds that Tromp is protected by qualified immunity against Alozie's First Amendment claim. Summary judgment will be granted.

Accordingly,

**IT IS ORDERED** ASU's Motion for Summary Judgment (Doc. 135) is **GRANTED IN PART AND DENIED IN PART**. ASU's motion is **GRANTED** as to Alozie's race or national origin discrimination claim. ASU's motion is **DENIED** as to Alozie's retaliation claim.

**IT IS FURTHER ORDERED** Tromp's Motion for Summary Judgment (Doc. 136) is **GRANTED**.

This matter is ready for trial on Alozie's retaliation claim. Accordingly, the Court enters the following orders.

_____

[12] In determining whether the contours of the right are clearly established, the Court may "look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Jessop*, 936 F.3d at 941 (quoting *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005)). The Fourth Circuit, which has created a similar academic speech exception in "the public university setting," stated that *Garcetti* does not apply to the speech of "a public university faculty member" unless the "assigned duties include a specific role in declaring or administering university policy," concluding that *Pickering* is the better analysis because it "permits a nuanced consideration of the range of issues that arise in the unique genre of academia." *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563–64 (4th Cir. 2011). But both parties in *Adams* agreed that the speech at issue involved scholarship and teaching. *Id.* at 563.

**IT IS ORDERED** all Motions in Limine are due **February 18, 2020**. Responses are due ten days afterward. No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the contents of each planned motion. No Motion in Limine should be filed if the other party does not oppose the relief requested.

**IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order, if not already filed, is due **February 18, 2020**.

**IT IS FURTHER ORDERED** the parties shall review the Court's standard Juror Questionnaire (available on the Court's website) and submit **NO MORE THAN 5 PROPOSED QUESTIONS EACH** to be added to the standard Juror Questionnaire with the Court's approval no later than **February 5, 2020**. Each proposed question shall stand alone and shall not contain sub-parts.

**IT IS FURTHER ORDERED** the parties shall submit a Joint Statement of the Case, of no more than a few short sentences for the Juror Questionnaire, no later than **February 5, 2020**.

**IT IS FURTHER ORDERED** Alozie shall submit a brief statement, of no more than 28 lines, explaining the amount and type of damages he will seek, no later than **February 5, 2020**.

**IT IS FURTHER ORDERED** the parties shall submit a second Joint Statement of the Case, of no more than two short paragraphs to be read to the jury, no later than **February 18, 2020**.

**IT IS FURTHER ORDERED** no later than **February 18, 2020**, the parties shall file and submit via email (silver_chambers@azd.uscourts.gov) in Word format proposed Jury Instructions in compliance with the procedures available on the Court's website, including but not limited to: 1) a *joint* set of proposed jury instructions where the parties' instructions agree; 2) a separate set of instructions (one for each party) where the parties do not agree; and 3) legal authority supporting all proposed instructions whether the parties agree or not. Where the parties do not agree, the opposing party shall clearly state its

objection to the proposed instruction and the proposing party shall clearly state its response.

**IT IS FURTHER ORDERED** the parties will jointly file a proposed form of verdict, or if the parties do not agree, they may separately file proposed forms of verdict no later than **February 18, 2020**.

**IT IS FURTHER ORDERED** no later than **February 18, 2020**, the parties shall deliver to chambers excerpts of the deposition testimony they propose to present at trial, in compliance with the procedures available on the Court's website (found in Deposition Designation Procedure for Judge Silver), including but not limited to: Plaintiffs highlighting in yellow the portions they wish to offer and Defendants highlighting in blue those portions they wish to offer. If either party objects to the proposed testimony, a specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin adjacent to the proposed testimony.

**IT IS FURTHER ORDERED** a final pretrial conference is set for **<u>March 18, 2020 at 2 pm</u>**, at which time the Court will review Juror Questionnaires. The parties shall meet and confer prior to this date regarding the Juror Questionnaires and email to the Courtroom Deputy no later than noon on **March 17, 2020** a list of any jurors they agree should be stricken for cause, along with any objections to jurors they do not agree should be stricken for cause. **The parties shall not file this list.** The Court will rule on any disputed jurors at the final pretrial conference.

**The parties will be supplied a disk containing the questionnaires approximately one week prior to the final pretrial conference. Counsel shall bring a copy of the questionnaires to the conference for review. Counsel are required to return the disk to the Courtroom Deputy and destroy all copies of the questionnaires no later than the last day of trial.**

**IT IS FURTHER ORDERED** trial to a jury is set for **<u>March 24, 2020 at 9:00 am</u>**. Estimated length of trial is 3 days.

…

…

**IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders, Forms & Procedures for Hon. Roslyn O. Silver.

Dated this 7th day of January, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge