1 **WO**

2

3

4

5

6 **IN THE UNITED STATES DISTRICT COURT**

7 **FOR THE DISTRICT OF ARIZONA**

8

9 Nicholas Alozie,                                                    No. CV-16-03944-PHX-ROS

10                    Plaintiff,                                      **ORDER**

11 v.

12 Arizona Board of Regents, et al.,

13                    Defendants.

14

15         Plaintiff Nicholas Alozie is a professor at Arizona State University, a public

16 university governed by Defendant Arizona Board of Regents (collectively, "ASU").[1]

17 Alozie brought this matter in 2016, alleging three claims under Title VII of the Civil

18 Rights Act of 1964 and two claims under 42 U.S.C. § 1983.  (Doc. 1-1).   He alleged

19 ASU discriminated and/or retaliated against him as a result of a comment he made during

20 an interview during the dean search for the ASU College of Letters and Sciences.  (Doc.

21 1-1 at 3).  After the Court granted partial summary judgment in favor of Defendants, the

22 parties proceeded to a jury trial on Alozie's Title VII retaliation claim.  (Doc. 152 at 23).

23 On August 16, 2021, the jury found ASU retaliated against Alozie because of his

24 protected expression, resulting in $357,000 in harm to Alozie.   (Doc. 244).    On

25 September 1, the Court denied ASU's initial motion for judgment as a matter of law and,

26 pursuant to the statutory cap codified at 42 U.S.C. § 1981a(b)(3)(D), reduced the damage

27 award to $300,000.  (Doc. 266 at 2).  Defendants now bring a Renewed Motion for

28

---

[1] Arizona State University is a non-jural entity.  The Arizona Board of Regents is the
entity subject to suit pursuant to A.R.S. § 15-1625(B)(3).

Judgment as a Matter of Law or Alternatively, for a new Trial or Remittitur pursuant to Federal Rules of Civil Procedure 50(b) and 59(d).   (Doc. 276).   The motion will be granted in part.

## BACKGROUND

Nicholas Alozie is a professor at ASU and has been the head of the Social Science Department at the Polytechnic campus since 2005.  (Doc. 22 at 5).  In November 2014, Alozie submitted himself for consideration to be dean of the ASU College of Letters and Sciences.  (Doc. 137 at 8).  Three other faculty members applied for the position: Duane Roen, the interim dean; Fabio Milner, a professor of mathematics and Director of Mathematics for STEM Education; and Joseph Carter, associate dean of ASU's school of business.  (Doc. 137 at 8).  Alozie is African-American and originally from Nigeria, Milner is Latino, and Roen and Carter are Caucasian.  (Doc. 141 at 17).  The fourteen-member search committee determined each of the applicants met the required qualifications for the position and interviewed each applicant.  (Doc. 137 at 9).  The interviews were held on December 1, 2014 by the committee and the committee chair, Marlene Tromp.

Alozie brought a written statement to his interview that he planned to read to the search committee.  (Doc. 137 at 9).  He distributed copies of the statement to the committee.  (Doc. 137 at 9).  Rather than permitting Alozie to read his statement aloud, the search committee went straight to its pre-planned questions (Doc. 137 at 9) because no other candidate had the opportunity to provide a similar statement to the committee. (Doc. 277 at 17).  Alozie's statement made clear that he thought the search process was a sham because Roen had already been preselected to be dean.  (Doc. 137 at 10).  In relevant part, Alozie's statement explained,

> I worked with Milt Glick, our former provost, and other top ASU officials to close the 'Revolving Door' of minority scholars leaving ASU as quickly as they arrived because they didn't think the environment was favorable enough to warrant their staying at ASU.  The complaint among young minority faculty was that ASU was simply a stopover and for a rewarding career with advancement they had to move to another university.  They never saw ASU as a place to build a career.
> . . .

> Indeed, the word in the College is that there is really no vacancy here, that this Dean's position has already been promised and that the university is simply going through the motions to dot its i's and cross its t's with this hiring process. Thus, I am expected, just like everyone else in the college to back off and let the impending coronation take place.

(Doc. 137-1 at 199-200).  The statement said Alozie "decided to apply for this position . . . to create a level playing field for women and minorities."  (Doc. 137-1 at 201).  The statement then went on to explain why he felt he was qualified, and ended with an expression of gratitude toward the committee for the "opportunity to talk about my eligibility for the position."  (Doc. 137-1 at 202).  Alozie verbally asked the committee "not to put a glass ceiling on my career."  (DF 238).

At the time of the interview, there were three African-American professors in the College of Letters and Sciences.  (Doc. 254 at 56).  From 1991 to 2014, only two African-Americans served as a dean at ASU.  (Doc. 254 at 27-28).  One of those two served as dean for 12 to 13 months, which Alozie testified is a "[v]ery, very unusual[ly]" short length of time to be dean.  (Doc. 254 at 28).  Alozie testified at trial that the longer-serving dean eventually became the butt of jokes within ASU "that he had hit a glass ceiling in the role" of dean because he spent so long in the position.  (Doc. 254 at 29).

After the interview, some members of the committee felt Alozie "came across as testy, defensive, and aggressive in his interview" and "viewed Plaintiff's accusation that they had decided on a candidate and were going through the emotions of a search as an attack on their integrity."  (Doc. 137 at 11-12).  Tromp testified at trial that the committee felt Alozie's statement was inflammatory.  (Doc. 279 at 69).  Ian Moulton, a member of the committee, testified at trial, "Alozie was saying that the entire process was corrupt, and the committee rightly or wrongly saw that as an attack on the committee, saying that we were part of some kind of plot.  And that was just too much for a lot of people in the room."  (Doc. 277 at 47).  Apple Bloom, another member of the committee, commented immediately after Alozie left, "that's one person we won't be hiring."  (Doc. 277 at 12).  Moulton testified that Bloom's reaction was unusual.  (Doc. 277 at 12).  Moulton's own impression was that Alozie's "confrontational style would not make him a successful

dean." (Doc. 277 at 27). Although Moulton's initial inclination "tend[ed] towards the idea that" giving a second interview to Alozie "might be the best way forward," Tromp eventually decided there would only be two interviews. (Doc. 277 at 29; DF 518). Tromp testified at trial that the committee chose to have two follow-up interviews but that it was not restricted to only advancing two candidates. (Doc. 279 at 65-66).

On the evening of December 1, committee member Pamela Stewart wrote Tromp arguing against offering Alozie a follow up interview. (DF 3209). Stewart wrote, "I can assess and analyze *why* the candidate can be defensive, assertive, and even challenge the way many of us see the world--our world at ASU. But at the point when our individual and collective integrity is not only questioned but attacked, I don't see how we can in good conscience, think this is someone who can then fairly represent us--the very people attacked." (DF 3029). In a July 2015 interview with ASU's Office of Equity and Inclusion, Stewart acknowledged "that part of what was at play were racial and cultural stereotypes—Pam [Stewart] did not want to make her decision inadvertently based on any of that." (DF 520). Stewart said she voted against advancing Alozie to the next round of interviews "because of what Nick [Alozie] had in his written component, which made her feel like the committee were being attacked and that they were essentially being dishonest, that the committee's integrity in terms of the process was being more than questioned – they were being accused of being untruthful." (DF 520). Stewart noted that one committee member, an African-American woman, who wanted to bring Alozie back for another round of interviews stopped coming to committee meetings altogether after Alozie was not invited to a second round of interviews. (DF 520).

Also on the evening of December 1, Tromp sent Vice Provost Barry Ritchie an email that said, "I have a quick (but thorny) question about the Dean search for you." (Doc. 137 at 12; Doc. 137-2 at 27). When Tromp and Ritchie spoke by phone later that evening, Tromp said Alozie had submitted an opening statement at his interview and made an allegation that the committee was biased. (Doc. 137 at 13). Tromp told Ritchie she was upset because she felt her integrity had been impugned. (Doc. 137 at 13).

Ritchie told Tromp that she should focus on her job as chair of the search committee, that the goal of the interview was to gather information relating to the decision to be made, and the committee had done that.  (Doc. 137 at 13).  He also told her that the slate of candidates and the process seemed fine, and that there were other processes for the kind of concerns that Alozie raised.  (Doc. 137 at 13).  Tromp's decision to extend only two second-round interviews may have resulted from this conversation with Ritchie.  (Doc. 277 at 25; Doc. 279 at 66).

Tromp received an email on December 3 from Dan Bivona, who was not a member of the committee or on the faculty of the College of Letters and Sciences.  (Doc. 279 at 72).  Bivona's email read, "My spies are everywhere and report today that you did an excellent job handling a difficult dean's candidate.  I'm not the least surprised.  But you really impressed at least one member of the committee who violated the rules to sing your praises.  I'm not sure why someone would apply for a job in order to misbehave at the interview."  (DF 3634).

The committee decided to advance Roen and Milner to a second round of interviews.  (Doc. 137 at 11).  "A small minority of the committee supported advancing Alozie as well."  (Doc. 137 at 11).  Tromp notified Alozie that the committee decided not to extend him a second interview on December 2.  (Doc. 137 at 13).  On December 14, Tromp emailed Page, asking "to share with you some things that I don't think belong in the written report" about each candidate's strengths and weaknesses.  (DF 1283).  On December 20, Tromp emailed a report to the ASU Provost, Robert Page, concluding that Roen and Milner were both capable of being dean.  (Doc. 137 at 15; DF 1288).  On January 14, 2015, Page offered Roen the position as Dean of the College of Letters and Sciences.  (Doc. 137 at 15).

In March 2015, Alozie met with Erin Ellison, a senior Equal Opportunity consultant with ASU's Office of Equity and Inclusion.  (Doc. 137-1 at 14; Doc. 141-2 at 5).  Ellison investigated, interviewing several members of the search committee, and issued a report to Searle on October 8, 2015 concluding that Alozie's statement "was not

the primary reason why [Alozie] did not move onto the final interview." (Doc. 141-1 at 27).  In August 2015, Alozie filed a discrimination charge with the Equal Employment Opportunity Commission.  (Doc. 137 at 15).  The EEOC issued a determination on June 10, 2016, stating: "Based on its investigation, the EEOC [was] unable to conclude that the information obtained constitutes violation of the statutes.  This does not certify [ASU] is in compliance with the statutes."  (Doc. 137 at 15).

Alozie testified he "was shocked" that he was not invited for a second interview. (Doc. 254 at 75, 105-06).  He felt it "hurtful" not only that he was not selected as dean, but also because, when he complained to the Office of Equity and Inclusion, he felt "they . . . ganged up against [him] and came after [him]."  (Doc. 254 at 79-80).  He testified that he does not enjoy his job as much as he used to.  (Doc. 254 at 81).  At trial, he asked the jury "to compensate [him] for all that hurt."  (Doc. 254 at 80).  Specifically, he asked the jury "to award [him] $100,000 every year that ASU refused to do right when they did wrong."  (Doc. 254 at 81).   In other words, Alozie asked for $700,000—$100,000 for each year from 2014 to 2021.  (Doc. 254 at 82).  He "ask[ed] this jury to send a message to ASU" and to hold ASU "accountable" by means of the damages award.  (Doc. 254 at 83).  Alozie did not testify to any specific physiological or psychological harm resulting from the dispute.  (Doc. 254 at 109-10).  He did not see a doctor or mental health professional as a result of the incident, nor did he offer expert testimony to establish his mental or emotional injury.  (Doc. 254 at 109-10).

Alozie brought this action in Arizona state court on September 2, 2016.  (Doc. 1-1 at 19).  His complaint raised five claims: (1) race and national origin discrimination under Title VII; (2) retaliation under Title VII; (3) disparate impact under Title VII; (4) violation of his First Amendment rights brought under 42 U.S.C. § 1983; and (5) violation of his rights under the Equal Protection Clause under § 1983.  (Doc. 22 at 14-19).  The Court granted a joint stipulation limiting the scope of Alozie's discrimination and retaliation claims, and dismissing most of the defendants from the § 1983 claims. (Doc. 117).  After the Court granted Defendants' motion for summary judgment in part,

the parties proceeded to trial only on Alozie's claim that ASU retaliated against him in response to his written statement submitted to the search committee.  (Doc. 152 at 23).

The jury initially reported that it was unable to reach a verdict.  (Doc. 281 at 9). The jury then received the Ninth Circuit's Model Jury Instruction 3.7, Deadlocked Jury (Doc. 281 at 9-12) and thereafter found in favor of Alozie on the unlawful retaliation claim and awarded damages in the amount of $357,000.  (Doc. 244).   On September 1, the Court denied ASU's initial motion for judgment as a matter of law and, pursuant to the statutory cap codified at 42 U.S.C. § 1981a(b)(3)(D), reduced the damage award to $300,000.  (Doc. 266 at 2).

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 50, district courts may set aside a jury verdict as a matter of law if a reasonable jury would not have had a legally sufficient evidentiary basis to support the verdict.  Fed. R. Civ. P. 50(a), (b).  "A renewed motion for judgment as a matter of law should be granted if the evidence permits only one conclusion and that conclusion is contrary to the jury's verdict."  *Martin v. California Dep't of Veterans Affs.*, 560 F.3d 1042, 1046 (9th Cir. 2009) (citing *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).   Conversely, a "jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible."  *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) (citing *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008)).  "In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion."  *Harper*, 553 F.3d at 1021 (citing *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227-28 (9th Cir. 2001)).  The Court must review the entire evidentiary record "in the light most favorable to the nonmoving party, draw all reasonable inferences in favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe."  *Id.*  While reviewing motions for judgment as a matter of law, the Court always remains conscious that the "jury is the

'constitutional tribunal provided for trying facts in courts of law.'" *Id.* (quoting *Berry v. United States*, 312 U.S. 450, 453 (1941)).

The Court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Recognized grounds for a new trial "include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Court "may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000) (citation omitted). Unlike a Rule 50 motion, a district court reviewing a motion for a new trial has "the duty, to weigh the evidence as [the Court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence," where the Court believes "the verdict is contrary to the clear weight of the evidence, or" to prevent a miscarriage of justice. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 2246, 256 (9th Cir. 1957), *cert denied*, 356 U.S. 968 (1958)). "[E]rroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial." *Id.* (citations omitted).

Even where a new trial is not necessary, remittitur may be appropriate if the Court deems a jury verdict grossly excessive or clearly not supported by evidence. *See Snyder v. Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Local No. 287*, 175 F.3d 680, 689 (9th Cir. 1999). If the Court, after viewing the evidence concerning damages in the light most favorable to the prevailing party, determines the damages award is grossly excessive, the Court must give the prevailing party "the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified." *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983).

1

**ANALYSIS**

2

**I.      Motion for judgment as a matter of law**

3

The jury had substantial evidence to support its finding of liability and a

4

reasonable juror could have found in favor of Alozie.

5

To establish a prima facie case of retaliation under Title VII, a plaintiff "must

6

establish that he took a protected activity under Title VII, his employer subjected him to

7

an adverse employment action, and there is a causal link between those two events."

8

*Vasquez v. County of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003).   If Alozie

9

establishes a prima facie case, "the burden then shifts to [ASU] to advance a legitimate,

10

nonretaliatory reason for any adverse employment action."  *Reynaga v. Roseburg Forest*

11

*Prod.*, 847 F.3d 678, 693 (9th Cir. 2017).  If ASU meet that burden, Alozie then has the

12

"ultimate burden" of showing that the proffered reason is pretextual.  *Id.*

13

Defendants challenge the sufficiency of Plaintiff's evidence as to all three

14

elements of Title VII retaliation.  (Doc. 276 at 3-11).  Defendants also argue the jury

15

instructions were inadequate and/or erroneous.  (Doc. 276 at 11-14).

16

**A. Protected activity**

17

An individual engages in protected activity under Title VII when the individual

18

has a "reasonable belief" that the employment practice being opposed is prohibited under

19

Title VII.  *See Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994); *Maner*

20

*v. Dignity Health*, 350 F.Supp.3d 899, 906 (D. Ariz. 2018).  The Ninth Circuit has held

21

courts "must balance 'the purpose of the Act to protect persons engaging reasonably in

22

activities opposing . . . discrimination, against Congress' equally manifest desire not to

23

tie the hands of employers in the objective selection and control of personnel.'"  *O'Day v.*

24

*McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1993) (quoting *Wrighten*

25

*v. Metropolitan Hosps., Inc.*, 726 F.2d 1346, 1355 (9th Cir. 1984)).

26

ASU argues Alozie's statement to the committee did not constitute protected

27

expression.  (Doc. 276 at 3).  ASU contends the statement "ma[de] no specific allegations

28

of race discrimination.  Instead, it [was] part of a discussion of Plaintiff's role as diversity

leader." (Doc. 276 at 4). But, as the Court noted in its summary judgment order, a jury could reasonably view as protected activity Alozie's assertion that minority scholars could not achieve a "rewarding career with advancement" at ASU because the "environment was [not] favorable enough to warrant their staying at ASU." (Doc. 152 at 16).

ASU now argues, based on a 1981 case from the Western District of Louisiana, that an employee's complaint at a job interview cannot qualify as protected expression. (Doc. 276 at 5) (quoting *Adams v. Gaudet*, 515 F.Supp. 1086, 1115 (W.D. La. 1981)). That case does not bind this Court. Even if it was binding, it is distinguishable. The court there held that allegations of race discrimination made in an interview for principalships in the Jefferson Davis Parish School District did not constitute protected activity. *See Adams*, 515 F.Supp. at 1115. Crucial to the Louisiana district court's holding was that an interview setting is a place where an employee's "full commitment and loyalty" is expected. *Id*. In this case, Alozie interviewed for a position that required a "demonstrated commitment to enhancing the diversity of the faculty, students, and staff." (Doc. 137 at 7). He attempted to advance his candidacy by drawing attention to the failures of ASU in the past, and what he would do to prevent the allegedly unlawful discrimination in the future. A jury could reasonably find that Alozie's comments, although not well-received by the committee, were reasonable in light of the nature of the role being interviewed for and the interview setting and that they concerned unlawful discrimination.

ASU further suggests Alozie's statement should not be considered as protected activity because Alozie delivered the statement to the dean search committee, rather than following the ordinary procedure for filing complaints of discrimination. (Doc. 276 at 4-5). However, the Court is aware of no precedent that requires employees to make protected statements only through designated complaint structures. Indeed, the Ninth Circuit has repeatedly recognized that informal complaints, including complaints about the treatment of others, are protected activity. *See, e.g.*, *Ray v. Henderson*, 217 F.3d

1234, 1240 n.3 (9th Cir. 2000) (citing *Equal Emp. Opportunity Comm'n v. Hacienda Hotel*, 881 F.2d 1504, 1514 (9th Cir. 1989)); *Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1994); *Passantino*, 212 F.3d at 506.

Viewing the facts in the light most favorable to Alozie, the non-movant, the Court finds the jury could reasonably believe Alozie's comments to the dean search committee constituted protected activity.

### B. Adverse employment action

In the Ninth Circuit, "an adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Ray*, 217 F.3d at 1237. To demonstrate an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The requirement of "material adversity" is meant "to separate significant from trivial harms." *Id.* (emphasis omitted); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). Nevertheless, the Ninth Circuit "take[s] an expansive view of the type of actions that can be considered adverse employment actions." *Ray*, 217 F.3d at 1241. "Termination, negative employment references, undeserved negative performance reviews, and denial of promotions qualify as adverse employment actions." *Foraker v. Apollo Grp., Inc.*, 427 F.Supp.2d 936, 941 (D. Ariz. 2006).

At the summary judgment stage in this case, the Court noted there exists a split among courts as to whether a failure to interview may constitute an adverse employment action. (Doc. 152 at 17). This Court has previously held that it does not. *See Foraker*, 427 F.Supp.2d at 942. Other courts, such as the Court of Appeals for the District of Columbia Circuit and the District Court for the District of Maine, have held that it does. *See Segal v. Harris Teeter Supermarkets, Inc.*, No. CV 15-1496 (BAH), 2016 WL 7223273, at *6 n.4 (D.D.C. Dec. 13, 2016); *Scarborough v. Nestle Waters N. Am. Inc.*, No. CIV 07-193-P-S, 2008 WL 4787573, at *9 (D. Me. Oct. 30, 2008), *report and recommendation adopted*, No. CIV 07-193-P-S-, 2008 WL 5236029 (D. Me. Dec. 15,

2008).  In light of the Ninth Circuit's "expansive" interpretation of adverse employment actions, and the unique nature of the complaint in this matter, the Court at summary judgment "f[ound] that declining to grant an individual a second interview, when the individual engaged in protected activity during the first interview, is reasonably likely to deter employees from engaging in protected activity."[2]  (Doc. 152 at 17).  Thus, the jury could reasonably conclude that having avenues for professional advancement closed off in such a manner constitutes materially adverse employment action.

### C. Causal connection

A Title VII retaliation plaintiff must also prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  In other words, the standard is but-for causation.  *Id.*  Such a causal link "can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action."  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011).

Tromp informed Alozie that he was no longer in the running for the deanship less than 24 hours after Alozie submitted his opening statement to the committee.  (Doc. 137 at 9, 13).  At summary judgment, the Court noted, "[t]his temporal proximity between the protected activity and the alleged adverse employment action, together with evidence that members of the search committee reacted strongly to the content of the opening statement, can provide sufficient circumstances evidence of retaliation."  (Doc. 152 at 17-18).  Although the Court might not have reached the same conclusion as the jury if it was the trier of fact, interpreting the facts in the light most favorable to Alozie, the Court cannot conclude the jury was unreasonable in determining that, but for Alozie's statement, he would have received a second interview.

### D. Burden-shifting

---

[2] Because Alozie stipulated that his retaliation claim was "limited to Defendant Arizona Board of Regents and Arizona State University's decision not to grant [Alozie] a second interview, ASU's "non-selection of [Alozie] for the position of Dean of the College of Letters and Sciences," is not considered as part of his retaliation claim.  (Doc. 116 at 2).

Having established that the jury had a sufficient evidentiary basis to determine Alozie proved his prima facie case, the burden then shifts to ASU to "articulate a legitimate nondiscriminatory reason for its decision."  *Ray*, 217 F.3d at 1240.

At trial, Tromp testified Roen and Milner were chosen not because they were qualified and Alozie was not, but rather because they were "[w]ho the committee thought was best to run the college."  (Doc. 279 at 114-15).  According to Tromp, the committee felt Alozie was "arrogan[t]" and was worried his "combative style" would not work well with ASU's President, Michael Crow.  (Doc. 279 at 102, 104-05).  The committee was also concerned, according to Tromp, that Alozie did "[n]ot [have] the same administrative experience" as the other candidates.  (Doc. 279 at 41).  These are adequate nondiscriminatory reasons for the committee's decision.  The burden again shifts back to Alozie to demonstrate that ASU's justification was pretextual.

Alozie has produced considerable evidence that committee members responded poorly to his statement.  *See, e.g.*, (Doc. 277 at 12, 49; Doc. 279 at 69; DF 520, 3029, 3634).  For example, Pamela Stewart said she did not want to advance Alozie to the next interview "because of what Nick [Alozie] had in his written component."  (DF 520).  Whether the committee members were reacting to protected expression within the statement, or merely its tone or something else, is a factual question of motive best left to the trier of fact.  Taking the facts in the light most favorable to Alozie, the combination of the committee members' adverse reactions to Alozie's statement and the temporal proximity between interview and the decision to not grant him a second interview is sufficient evidence for the jury to find ASU's justification was pretextual.

The jury therefore had a sufficient evidentiary basis to support its finding that ASU was liable for Title VII retaliation in its decision not to grant Alozie a second interview.

### E.  Jury instructions

ASU also argues the Court's jury instructions were inadequate or erroneous. (Doc. 276 at 11-15).

"Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002). "The trial court has broad discretion in formulating jury instructions . . . So long as the instructions on each element of the case are adequate to ensure that the jury fully understands the issues, no particular formulation or wording is necessary." *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1044 (9th Cir. 1987) (citations omitted). Each party is "entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009).

ASU objects that the Court refused its proposed instruction as to protected activity. (Doc. 276 at 11). The Court refused ASU's instruction on the ground that the "topic is adequately addressed by Ninth Circuit Model Civil Jury Instruction 10.10." (Doc. 197 at 2). At pretrial conferences, ASU proposed the following instruction:

> [A] plaintiff opposes unlawful employment practices if he complains about conduct that he reasonably believes to be discriminatory. The opposition must be directed toward a discriminatory act by the employer, and it must be reasonable in light of the circumstances. Dr. Alozie claims that he opposed unlawful employment practices when he said he had worked with "top ASU officials to close the 'Revolving Door' of minority scholars leaving ASU as quickly as they arrived because they didn't think the environment was favorable enough to warrant their staying at ASU."

(Doc. 214-1 at 2). The Court instead gave the following instruction, which provided more general guidance regarding what might constitute protected opposition activity:

> [A] plaintiff opposes unlawful employment practices if he complains about conduct that he reasonably believes to be discriminatory, such as an employer failing to hire, refusing to hire, or discharging any individual because of such individual's race; an employer discriminating against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of such individual's race; or an employer limiting, segregating, or classifying employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee because of such individual's race.

(Doc. 245 at 13). ASU objects that "[t]he Court's instruction thus used only the first sentence of ASU's proposed instruction." (Doc. 276 at 12).

ASU suggests "the length of the deliberations, and the jury's interactions with the

Court during those deliberations, indicated that the Court's more generic and summary instruction did not provide sufficient guidance regarding the narrow claim that had been set for trial." (Doc. 276 at 13). On the second day of deliberations, the jury asked, "[r]egarding element 1 . . . Is the opposition limited solely to the written statement?" (Doc. 246). The Court responded, "the written statement is very important. So there's no question it involves the written statement. Whether or not the facts showed opposition to other unlawful employment practices is for you to decide. That's a factual issue." (Doc. 276 at 13). ASU argues this response was inappropriate because the "Court had previously and clearly ruled that most of the statements in the written statement were not legally protected and could form the basis for a lawful decision regarding Alozie's candidacy for the Dean position." (Doc. 276 at 13). But the jury was not asking whether the entire written statement constituted opposition activity and never communicated misunderstanding on that point. Rather, the jury asked whether Alozie's verbal statements could constitute protected activity. The answer was that verbal statements could qualify, but the Court was careful not to indicate to the jury that they did qualify, so as not to prejudice the jury against the defense.

The Court finds the challenged instruction was not erroneous as a matter of law and did not prejudice the jury against the defendant. Contrary to ASU's assertion, the Court is not required to "insert[] a description of the activity that this Court had determined was arguably protected." (Doc. 276 at 14). Although the jury evidently felt comfortable asking a follow-up question, they did not feel it necessary to ask whether the whole statement qualified. The Court infers based on the arguments at trial that the jury was not confused. ASU may have preferred its own formulation, but it was not entitled to it. The jury was accurately instructed as to the elements of retaliation and was not prejudiced by the Court's decision to instruct the jury about various forms of protected activity.

## II.     Remittitur

ASU contends the jury's $357,000 damages award is grossly excessive. (Doc. 276

at 15-17).  ASU argues Alozie did not demonstrate he was injured.  ASU also argues Alozie's request for damages to be increased due to the length of time it took for him to receive relief, and for the "jury to send a message to ASU," sought damages on an improper basis.  (Doc. 276 at 16-17).

"Where an award of damages is 'grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork,' and gives rise to an inference that 'passion and prejudice' tainted the jury's finding of liability, a new trial may be in order."  *Snyder*, 175 F.3d at 689 (quoting *Los Angeles Mem'l Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986); *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987)).  However, "[w]here there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict."  *Seymour*, 809 F.2d at 1387.

Here, there is no evidence the jury's liability finding was tainted by passion or prejudice.  The jury deliberated for two days and provided no indication they considered the matter in anything other than a deeply conscientious fashion.  Moreover, the jury did not award Alozie all of the $700,000 he asked for.  It awarded him just over half of that sum.  These behaviors are not what one might expect from a jury affected by passion or prejudice.  The Court finds that a new trial is not warranted.

Nevertheless, the damages award is excessive and "clearly not supported by the evidence," *Snyder*, 175 F.3d at 689, and must be reduced.  Alozie has provided virtually no evidence that he was harmed in the amount of $300,000.  Alozie testified he suffered injury.  (Doc. 254 at 80).  But his testimony on this point was vague and he did not testify to a particular injury.  (Doc. 254 at 109-10).  He did not see a doctor or mental health professional.  (Doc. 254 at 109-10).  He has not provided the essential facts and thus no reason to believe he suffered sufficient physiological or psychological harm worthy of a $300,000 judgment.

Relying on *Arizona v. Asarco LLC*, 773 F.3d 1050, 1055-60 (9th Cir. 2014) (en banc), Alozie unpersuasively argues that the $300,000 cap on damages renders awards

within the statutory limits presumptively not excessive.  (Doc. 289 at 6-7).  Alozie claims the *Asarco* en banc court held, "a punitive damages award that falls near or within the limitations of the statutory caps in 42 U.S.C. § 1981a . . . is never going to be deemed 'grossly excessive' even in a case where the compensatory damages were only nominal – $1.00."  (Doc. 289 at 6-7).  "By same reasoning," Alozie claims, "a compensatory damages award within the caps . . . should not be deemed 'grossly excessive.'"  (Doc. 289 at 6-7) (emphasis omitted).  Alozie's interpretation of *ASARCO* is clearly wrong. *ASARCO* concerned punitive damages.  The fact that the Ninth Circuit permits significant punitive damages in no way means it permits significant compensatory damages in the absence of commensurate harm.  *Cf. Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 54 (1991) (O'Connor, J., dissenting) ("Unlike compensatory damages, which are tied to an actual injury, there is no objective standard that limits the amount of punitive damages."). Requiring plaintiffs to prove an amount of damages for emotional harm is consistent with the Supreme Court's instruction that "[d]istress is a personal injury familiar to law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff. . . . we hold that neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury was actually caused."  *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978).

Several of the harms Alozie testified to and requested damages for at trial are not valid bases for damages.  For example, damages cannot be increased to the degree Alozie requested due to length of time the litigation remained pending.  Although prejudgment interest is available under Title VII in some circumstances, *see Loeffler v. Frank*, 486 U.S. 549, 565 (1988), it is not awarded in the $100,000-per-year increments Alozie demanded.  (Doc. 254 at 81) (asking the jury "to award [him] $100,000 every year that ASU refused to do right when they did wrong").   And it "is not awarded as a penalty; it is merely an element of just compensation."  *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 197 (1995).  Alozie cannot reasonably claim that he suffered injury amounting to $100,000 per year that ASU disputed its liability.  Rather, properly

characterized, he desired an increased award to punish ASU for taking so long "to do right when they did wrong." (Doc. 254 at 81). Alozie's desire to send ASU a message (Doc. 254 at 83) is in the nature of a request for punitive damages. *See Bachrach v. Covenant Transp., Inc.*, No. 2:10-cv-315-PHX-GMK, 2012 WL 2317768, at *2 (D. Ariz. June 18, 2012) ("A closing argument . . . that the jury could send a message . . . through its verdict is viewed as injecting the issue of punitive damages into a case through the argument, even though such damages had not been pled.") (citation omitted) (omissions in original).

Alozie has no claim for punitive damages. A party may recover punitive damages under 42 U.S.C. § 1981a "if the complaining party demonstrates the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Alozie has made no such showing here, but equally importantly, he did not seek punitive damages in his complaint. (Doc. 22 at 19). Alozie's recovery is limited to the injuries that can be remedied by compensatory damages.

It also appears that Alozie seeks damages for hurtful things said by defense counsel at trial. (Doc. 254 at 78) ("I am asking them [the jury] to compensate me for the harm that has been done to me, and that harm is far-reaching. It is devastating for you to spend 30 years of your life working, and [defense counsel] walks in here and says a group of people are not impressed with your administrative experience."). The Court will not hold that statements of defense counsel made at trial can increase the liability of his or her clients. As Judge Posner many years ago observed, and as several other courts have held, an "alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages." *See, e.g.*, *Stoleson v. United States*, 708 F.2d 1217, 1223 (7th Cir. 1983); *Knussman v. Maryland*, 272 F.3d 625, 642 (4th Cir. 2001); *Wright v. Watkins & Shepard Trucking, Inc.*, No. 2:11-CV-1575-LRH-GWF, 2016 WL 10749220, at *10 (D. Nev. Jan. 19, 2016).

After excluding Alozie's requests for relief above as non-compensable, the

following statements constitute the only testimony regarding harms that may be remedied by compensatory damages:

- "if I tell you the type of relationship I had with my six children when this was going on, I found myself becoming very angry very easily. I didn't know who to get angered at anymore. Especially when you're not used to this type of disappointment in your life." (Doc. 254 at 79).

- "It's been very, very hurtful to me. It's been very stressful to me." (Doc. 254 at 80).

- "I can't [enjoy my job as much as I used to]. I don't anymore. For me its just a job now because I have been told that I can't do anything right." (Doc. 254 at 81).

- "It hurts. It's very stressful. It has affected my family life. It has affected the way I look at my colleagues. It has affected the way -- my outlook in life." (Doc. 254 at 82).

Unlike some other circuits, the Ninth Circuit does not require a Title VII plaintiff to provide objective evidence of emotional harm in order to recover. *See Passantino*, 212 F.3d at 513. The Ninth Circuit also does not require plaintiffs to submit evidence of economic loss or mental or physical symptoms to obtain compensatory damages for emotional distress. *See Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994). Although plaintiffs ordinarily provide corroborating testimony to prove their injury, *see Carey*, 435 U.S. at 264 n.20 ("We use the term 'distress' to include mental suffering or emotional anguish. Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others."); *Passantino*, 212 F.3d at 513-14 (emphasizing that the plaintiff's injury was corroborated by her husband and sister), the Court does not understand precedents to require corroboration. Therefore, the jury could reasonably find the above statements constituted the sort of harm that could be compensated within the meaning of the instruction administered to the jury regarding damages. (Doc. 245 at 14).

Although the Court is conscious that mental suffering is "essentially subjective," *Carey*, 435 U.S at 264 n.20, and does not lightly displace the finding of the jury regarding the severity of Alozie's injury, the Court concludes the damages award in this case is grossly excessive and clearly not supported by the evidence. Alozie is not required under

the Ninth Circuit's precedents to provide objective evidence of emotional harm to recover, but the Court will not award hundreds of thousands of dollars in damages for mere "garden variety" emotional distress. *Cf. Velez v. Roche*, 335 F.Supp.2d 1022, 1041 (N.D. Cal. 2004) (refusing to reduce a Title VII judgment below the statutory cap because plaintiff demonstrated she suffered from clinical depression, which distinguished her case from "garden variety" emotional distress). The Court is unable to find—and the parties have not produced—a single Title VII case in which a court upheld a jury verdict as large as the one at issue here in the absence of a clinical diagnosis, an economic injury, or a physiological manifestation of harm. For example, in *Passantino*, the plaintiff testified she suffered rashes, stomach problems, and anxiety as a result of her employer's tortious behavior. *See Passantino*, 212 F.3d at 513. In *Velez*, the plaintiff suffered from clinical depression. *See Velez*, 335 F.Supp.2d at 1041. In *Turic v. Holland Hospitality*, plaintiff testified she suffered from nightmares, weight loss during her pregnancy, and excessive nervousness. *See Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215-16 (6th Cir. 1996).

Alozie's failure to testify to identifiable harms and injury place his case more in line with cases such as *Hetzel v. County of Prince William*, 89 F.3d 169, 173 (4th Cir. 1996) and *Rodgers v. Fisher Body Division, General Motors Corp.*, 739 F.2d 1102, 1108 (6th Cir. 1984). In *Hetzel*, the Fourth Circuit held a $500,000 award in a Title VII case grossly excessive in light of the plaintiff's "thin evidence" of emotional distress. *See Hetzel*, 89 F.3d at 171-73. The *Hetzel* court did not consider whether the district court's reduction of the judgment to $250,000 was proper. *See id.* at 173 n.2. In *Rodgers*, the Sixth Circuit held a $300,000 award for lost wages and emotional distress grossly excessive because the plaintiff's sole evidence of harm was brief testimony discussing how "humiliating" it was to be forced to go on welfare for seven months. *See Rodgers*, 739 F.2d at 1108.

None of the several above cases provide much guidance as to the exact amount of damages that would be appropriate in a circumstance such as this. The Court is left to the

sense of what is reasonable or justified under the circumstances.  *See Fenner*, 716 F.2d at 603 (providing the Court may remit damages to "a reduced amount of damage which the court considers justified").  In light of the jury's strong preference in favor of Alozie, as evidenced by the $357,000 verdict, the Court will reduce the award to the greatest amount it thinks a juror could reasonably believe was commensurate to the actual injury Alozie suffered.  The Court therefore will not reduce the award to the $75,000 requested by ASU (Doc. 276 at 17), because the Court believes a reasonable juror could award more based on the testimony provided in this case.  Instead, the damages award will be remitted to one-third of the jury verdict, $119,000.[3]  The Court believes this figure adequately respects the jury's verdict without compensating Alozie in a manner grossly exceeding the extent of the emotional distress he suffered.

## CONCLUSION

For the reasons set forth above, ASU is not entitled to judgment as a matter of law because the jury reasonably reached its finding of liability.  A new trial is not warranted because there is no evidence the jury was infected by passion or prejudice.  But the jury verdict of $357,000 for ASU's unlawful retaliation is grossly excessive in light of the relatively minimal evidence of harm Alozie has provided.  Remittitur is therefore required to vindicate the interests of justice.  The damages award in Alozie's favor will be remitted to $119,000.

Accordingly,

**IT IS ORDERED** Defendants' Renewed Motion for Judgment as a Matter of Law or Alternatively, for a New Trial or Remittitur (Doc. 276) is **GRANTED IN PART**.

---

[3] The Court is required to "outline specifically, with reference to the evidence presented at trial, the reasons for the amount" of remittitur.  *Cosby v. AutoZone, Inc.*, 445 F.App'x. 914, 917 (9th Cir. 2011).  Given that the evidence of compensable harm is all entirely non-economic and is based entirely on the jury's and the Court's subjective impression of the harm Alozie testified about at trial, it is difficult to set forth particular evidence justifying a one-third reduction in damages in a manner that might be possible if Alozie had suffered a pecuniary injury.  The Court arrived at the one-third reduction (from $357,000 to $119,000) by considering Alozie's testimony regarding his emotional suffering, the impact on his family life, and a loss of satisfaction in his employment.  Although these harms seem insufficient to justify a $300,000 award, the Court believes a reasonable juror could have felt they constituted harm greater than $100,000.

Defendant's request for judgment as a matter of law is denied.  Defendant's request for a new trial is denied.  Defendant's request for remittitur is granted.

**IT IS FURTHER ORDERED** Plaintiff shall, no later than December 14, file a statement electing between a judgment of $119,000.00 in favor of Plaintiff and against Defendant Arizona Board of Regents, or conducting a new trial to determine the amount of Defendant's liability.

Dated this 29th day of November, 2021.

Honorable Roslyn O. Silver
Senior United States District Judge